673 F.2d 1036
 Richard Frank ADAMS and Anthony Corbett Sullivan,
Plaintiffs-Appellants,
v.
Joseph D. HOWERTON, Acting District Director of the
Immigration and Naturalization Service of the
United States Department of Justice,
Defendant-Appellee.
 No. 80-5209.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 7, 1981.
Decided Feb. 25, 1982.
 
 David M. Brown, Robert A. DePiano, Brown, Weston & Sarno, Beverly Hills, Cal., for plaintiffs-appellants.
 Dzintra I. Janavs, Asst. U. S. Atty., Los Angeles, Cal., argued, for defendant-appellee; Andrea Sheridan Ordin, U. S. Atty., Eva S. Halbreich, Asst. U. S. Atty., Los Angeles, Cal., on brief.
 Appeal from the United States District Court for the Central District of California.
 Before WALLACE and TANG, Circuit Judges, and TURRENTINE,* District Judge.
 WALLACE, Circuit Judge:
 
 
 1
 Adams, a male American citizen, and Sullivan, a male alien, appeal from the district court's entry of summary judgment for Howerton, Acting District Director of the Immigration and Naturalization Service (INS). The district court held that their homosexual marriage did not qualify Sullivan as Adams's spouse pursuant to section 201(b) of the Immigration and Nationality Act of 1952, as amended (the Act), 8 U.S.C. § 1151(b). We affirm.
 
 
 2
 * Following the expiration of Sullivan's visitor's visa, Adams and Sullivan obtained a marriage license from the county clerk in Boulder, Colorado, and were "married" by a minister. Adams then petitioned the INS for classification of Sullivan as an immediate relative of an American citizen, based upon Sullivan's alleged status as Adams's spouse. The petition was denied, and the denial was affirmed on appeal by the Board of Immigration Appeals. Adams and Sullivan then filed an action in district court challenging this final administrative decision on both statutory and constitutional grounds. The parties agreed that there was no genuine issue as to any material fact and that the only issues presented were issues of law. On cross-motions for summary judgment, the district court entered judgment for the INS. Adams v. Howerton, 486 F.Supp. 1119 (C.D.Cal.1980). This appeal followed.
 
 II
 
 3
 Two questions are presented in this appeal: first, whether a citizen's spouse within the meaning of section 201(b) of the Act must be an individual of the opposite sex; and second, whether the statute, if so interpreted, is constitutional.
 
 
 4
 Section 201(a) of the Act establishes immigration quotas and a system of preferential admissions based upon the existence of close family relationships. The section excludes immediate relatives of United States citizens from the quota limitations, which have been periodically revised by Congress. 8 U.S.C. § 1151(a). Section 201(b) defines "immediate relatives" to include the spouses of United States citizens. 8 U.S.C. § 1151(b).[1] Section 201(b) was added to the Act in its present form by the Immigration and Nationality Act Amendments of 1965, Pub.L. No. 89-236, § 1, 79 Stat. 911. Neither that section nor any subsequent amendments further define the term "spouse" directly.
 
 
 5
 Cases interpreting the Act indicate that a two-step analysis is necessary to determine whether a marriage will be recognized for immigration purposes. The first is whether the marriage is valid under state law. The second is whether that state-approved marriage qualifies under the Act. Both steps are required. E.g., United States v. Sacco, 428 F.2d 264, 270 (9th Cir.) (construing 8 U.S.C. §§ 1302, 1306(a), 1451(a), (e)), cert. denied, 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140 (1970). This same two-step analysis is appropriate under section 201(b). We first consider the validity of the marriage under state law.
 
 
 6
 In visa petition proceedings addressing this question, the Board of Immigration Appeals has held that the validity of a marriage is governed by the law of the place of celebration. See In re Gamero, 14 I. & N. Dec. 674 (B.I.A.1974). See also Gee Chee On v. Brownell, 253 F.2d 814, 817 (5th Cir. 1958). Because a valid marriage is necessary for spouse status under the immigration laws, In re P., 4 I. & N. Dec. 610, 613 (B.I.A.1952), we look to Colorado law to determine whether the Adams-Sullivan marriage is valid.
 
 
 7
 Adams and Sullivan argue, in effect, that we need not reach this question because each is a putative spouse under Colorado law. They claim that they held a good faith belief that they were married. The district judge rejected this claim as without merit, observing that Adams and Sullivan could not have been without doubts concerning the validity of their marriage. 486 F.Supp. at 1123. We need not reach the issue. Even if Adams and Sullivan held a good faith belief that they were legally married, it is clear that the provisions of Colorado law they cite were enacted not to confer validity on the marriage of a putative spouse, but rather to protect property rights and insure support for children when the invalidity of such a marriage is discovered. See Colo.Rev.Stat. § 14-2-111 (1973).
 
 
 8
 It is not clear, however, whether Colorado would recognize a homosexual marriage. There are no reported Colorado cases on the subject. The Colorado Attorney General in an informal, unpublished opinion addressed to a member of the Colorado legislature three days after the alleged marriage in question occurred, stated that purported marriages between persons of the same sex are of no legal effect in Colorado. Colorado statutory law, however, neither expressly permits nor prohibits homosexual marriages. Some statutes appear to contemplate marriage only as a relationship between a male and a female. See Colo.Rev.Stat. § 14-2-104 (1973) ("Formalities. Marriage between a man and a woman, licensed, solemnized, and registered ... is valid in this state.").
 
 
 9
 While we might well make an educated guess as to how the Colorado courts would decide this issue, it is unnecessary for us to do so.[2] We decide this case solely upon construction of section 201(b), the second step in our two-step analysis.
 
 III
 
 10
 Even if the Adams-Sullivan marriage were valid under Colorado law, the marriage might still be insufficient to confer spouse status for purposes of federal immigration law. So long as Congress acts within constitutional constraints, it may determine the conditions under which immigration visas are issued. Therefore, the intent of Congress governs the conferral of spouse status under section 201(b), and a valid marriage is determinative only if Congress so intends.
 
 
 11
 It is clear to us that Congress did not intend the mere validity of a marriage under state law to be controlling. Although the 1965 amendments do not define the term "spouse," the Act itself limits the persons who may be deemed spouses. Section 101(a)(35) of the Act specifically provides that the term "spouse" does not include
 
 
 12
 a spouse, wife, or husband by reason of any marriage ceremony where the contracting parties thereto are not physically present in the presence of each other, unless the marriage shall have been consummated.
 
 
 13
 8 U.S.C. § 1101(a)(35). Furthermore, valid marriages entered into by parties not intending to live together as husband and wife are not recognized for immigration purposes. Garcia-Jaramillo v. INS, 604 F.2d 1236, 1238 (9th Cir. 1979), cert. denied, 449 U.S. 828, 101 S.Ct. 94, 66 L.Ed.2d 32 (1980); Voliantis v. INS, 352 F.2d 766 (9th Cir. 1965). See also Lutwak v. United States, 344 U.S. 604, 611, 73 S.Ct. 481, 486, 97 L.Ed. 593 (1953); United States v. Sacco, supra, 428 F.2d at 269-71. Therefore, even though two persons contract a marriage valid under state law and are recognized as spouses by that state, they are not necessarily spouses for purposes of section 201(b).
 
 
 14
 We thus turn to the question of whether Congress intended that homosexual marriages confer spouse status under section 201(b). Where a statute has been interpreted by the agency charged with its enforcement, we are ordinarily required to accord substantial deference to that construction, and should follow it "unless there are compelling indications that it is wrong." New York Dept. of Social Services v. Dublino, 413 U.S. 405, 421, 93 S.Ct. 2507, 2517, 37 L.Ed.2d 688 (1973); Faulkner v. Watt, 661 F.2d 809, 812 (9th Cir. 1981); United States v. Standard Oil Co. of California, 618 F.2d 511, 518 (9th Cir. 1980). Thus, we must be mindful that the INS, in carrying out its broad responsibilities, has interpreted the term "spouse" to exclude a person entering a homosexual marriage.
 
 
 15
 While we do accord this construction proper weight, we base our decision primarily on the Act itself. See Southeastern Community College v. Davis, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979); Usery v. First Nat'l Bank of Arizona, 586 F.2d 107, 111 (9th Cir. 1978). Nothing in the Act, the 1965 amendments or the legislative history suggests that the reference to "spouse" in section 201(b) was intended to include a person of the same sex as the citizen in question. It is "a fundamental canon of statutory construction" that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). See Rhodes v. Republic Nat'l Life Ins. Co., 501 F.2d 1213, 1217 (9th Cir. 1974), cert. denied, 420 U.S. 928, 95 S.Ct. 1126, 43 L.Ed.2d 298 (1975). The term "marriage" ordinarily contemplates a relationship between a man and a woman. See Webster's Third New International Dictionary 1384 (1971); Black's Law Dictionary 876 (5th ed. 1979). The term "spouse" commonly refers to one of the parties in a marital relationship so defined. Congress has not indicated an intent to enlarge the ordinary meaning of those words. In the absence of such a congressional directive, it would be inappropriate for us to expand the meaning of the term "spouse" for immigration purposes. Consumer Prods. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Our role is only to ascertain and apply the intent of Congress. See, e.g., Lavin v. Marsh, 644 F.2d 1378, 1381 (9th Cir. 1981); Hughes Air Corp. v. Public Utilities Comm'n of California, 644 F.2d 1334, 1337 (9th Cir. 1981).
 
 
 16
 Our conclusion is supported by a further review of the 1965 amendments to the Act. These amendments not only added section 201(b) in its present form, but also amended the mandatory exclusion provisions of section 212(a) of the Act, 8 U.S.C. § 1182(a). Yet, both section 15(b) of the amendments, Pub.L. No. 89-236, § 15(b), 79 Stat. 911, 919 (codified at 8 U.S.C. § 1182(a)(4)), and the accompanying Senate Report, S.Rep. No. 748, 89th Cong., 1st Sess., reprinted in, (1965) U.S.Code Cong. & Ad.News 3328, 3343, clearly express an intent to exclude homosexuals. See Boutilier v. INS, 387 U.S. 118, 121, 87 S.Ct. 1563, 1565, 18 L.Ed.2d 661 (1967). As our duty is to ascertain and apply the intent of Congress, we strive to interpret language in one section of a statute consistently with the language of other sections and with the purposes of the entire statute considered as a whole. Philbrook v. Glodgett, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). We think it unlikely that Congress intended to give homosexual spouses preferential admission treatment under section 201(b) of the Act when, in the very same amendments adding that section, it mandated their exclusion. Reading these provisions together, we can only conclude that Congress intended that only partners in heterosexual marriages be considered spouses under section 201(b).
 
 IV
 
 17
 We next consider the constitutionality of the section 201(b) so interpreted. Adams and Sullivan contend that the law violates the equal protection clause[3] because it discriminates against them on the bases of sex and homosexuality. They also argue that review of this claimed violation must be pursuant to a strict standard because the federal law abridges their fundamental right to marry.[4] We need not and do not reach the question of the nature of the claimed right[5] or whether such a right is implicated in this case. Even if it were, we would not apply a strict scrutiny standard of review to the statute. Congress has almost plenary power to admit or exclude aliens, see Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977); Kleindienst v. Mandel, 408 U.S. 753, 765-67, 92 S.Ct. 2576, 2583-84, 33 L.Ed.2d 683 (1972), and the decisions of Congress are subject only to limited judicial review. Fiallo v. Bell, supra, 430 U.S. at 792, 97 S.Ct. at 1478, quoting Hampton v. Mow Sun Wong, 426 U.S. 88, 101 n.21, 96 S.Ct. 1895, 1904 n.21, 48 L.Ed.2d 495 (1976).
 
 
 18
 In Kleindienst v. Mandel, the Supreme Court refused to balance the government's interest in excluding certain aliens against the first amendment interests of American citizens who sought to communicate with the excluded aliens. In reaching its decision, the Court stated:
 
 
 19
 Recognition that First Amendment rights are implicated, however, is not dispositive of our inquiry here. In accord with ancient principles of the international law of nation-states, the Court in The Chinese Exclusion Case, 130 U.S. 581, 609 (9 S.Ct. 623, 631, 32 L.Ed. 1068) (1889), and in Fong Yue Ting v. United States, 149 U.S. 698 (13 S.Ct. 1016, 37 L.Ed. 905) (1893), held broadly ... that the power to exclude aliens is 'inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachment and dangers-a power to be exercised exclusively by the political branches of government ....' Since that time, the Court's general reaffirmations of this principle have been legion. The Court without exception has sustained Congress' 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden.' Boutilier v. Immigration and Naturalization Service, 387 U.S. 118, 123 (87 S.Ct. 1563, 1567, 18 L.Ed.2d 661) (1967). '(O) ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens. Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339 (29 S.Ct. 671, 676, 53 L.Ed. 1013) (1909).
 
 
 20
 408 U.S. at 765-67, 92 S.Ct. 2583 (footnotes omitted). Thus, the Court has upheld the broad power of Congress to determine immigration policy in the face of challenges based upon the first amendment, id. (statutory exclusion of individuals advocating world communism), the due process clause, Boutilier v. INS, supra (vague statutory language excluding homosexuals), as well as the equal protection component of fifth amendment due process and constitutionally-implied fundamental rights, Fiallo v. Bell, supra, 430 U.S. at 794, 97 S.Ct. at 1479 (discrimination based on sex and illegitimacy and denial of fundamental constitutional interests in family relationships). In Fiallo v. Bell, the Court observed "that in the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.' " Id. at 792, 97 S.Ct. at 1478, quoting Mathews v. Diaz, 426 U.S. 67, 80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976). Explaining the "special judicial deference to congressional policy choices in the immigration context," id. at 793, 97 S.Ct. at 1479 (footnotes omitted), the Court stated:
 
 
 21
 Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process.... But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government.
 
 
 22
 Id. at 792 n.4, 97 S.Ct. at 1478 n.4, quoting Galvan v. Press, 347 U.S. 522, 530-32, 74 S.Ct. 737, 743, 98 L.Ed. 911 (1954).
 
 
 23
 The scope of this very limited judicial review has not been further defined; the Supreme Court has not determined what limitations, if any, the Constitution imposes on Congress. Faced with numerous challenges to laws governing the exclusion of aliens and the expulsion of resident and non-resident aliens, the Court has consistently reaffirmed the power of Congress to legislate in this area.
 
 
 24
 We do know that where there is a rational basis for Congress's exercise of its power, whether articulated or not, the Court will uphold the immigration laws that Congress enacts. Hampton v. Mow Sun Wong, supra, 426 U.S. at 103, 96 S.Ct. at 1905. See also Fiallo v. Bell, supra, 430 U.S. at 799, 97 S.Ct. at 1481. We do not know whether this test must be met to validate legislation such as section 201(b) of the Act because the Court teaches that we only have a limited judicial review. As observed earlier, in this area of the law, Congress has almost plenary power and may enact statutes which, if applied to citizens, would be unconstitutional. Thus, it is not clear what treatment a seemingly irrational statute should receive. It may well depend on the nature of the statute. The Court has suggested, in dicta, that a statute could be "so baseless as to be violative of due process and therefore beyond the power of Congress." Galvan v. Press, supra, 347 U.S. at 529, 74 S.Ct. at 742. On the other hand, the Court has not dismissed the possibility that "there may be actions of the Congress with respect to aliens that are so essentially political in character as to be nonjusticiable." Fiallo v. Bell, supra, 430 U.S. at 793 n.5, 97 S.Ct. at 1478 n.5.
 
 
 25
 We need not, however, delineate the exact outer boundaries of this limited judicial review. We hold that Congress's decision to confer spouse status under section 201(b) only upon the parties to heterosexual marriages has a rational basis and therefore comports with the due process clause and its equal protection requirements. There is no occasion to consider in this case whether some lesser standard of review should apply.
 
 
 26
 Congress manifested its concern for family integrity when it passed laws facilitating the immigration of the spouses of some valid heterosexual marriages. This distinction is one of many drawn by Congress pursuant to its determination to provide some-but not all-close relationships with relief from immigration restrictions that might otherwise hinder reunification in this country. See Fiallo v. Bell, supra, 430 U.S. at 787, 97 S.Ct. at 1473, 52 L.Ed.2d 50. In effect, Congress has determined that preferential status is not warranted for the spouses of homosexual marriages. Perhaps this is because homosexual marriages never produce offspring, because they are not recognized in most, if in any, of the states, or because they violate traditional and often prevailing societal mores. In any event, having found that Congress rationally intended to deny preferential status to the spouses of such marriages, we need not further "probe and test the justifications for the legislative decision." Id. at 799, 97 S.Ct. at 1481.
 
 
 27
 We hold that section 201(b) of the Act is not unconstitutional because it denies spouses of homosexual marriages the preferences accorded to spouses of heterosexual marriages.
 
 
 28
 AFFIRMED.
 
 
 
 *
 Honorable Howard B. Turrentine, United States District Judge, Southern District of California, sitting by designation
 
 
 [1]
 Section 201(b), 8 U.S.C. § 1151(b), provides:
 The 'immediate relatives' referred to in subsection (a) of this section shall mean the children, spouses, and parents of a citizen of the United States: Provided, That in the case of parents, such children must be at least twenty-one years of age. The immediate relatives specified in this subsection who are otherwise qualified for admission shall be admitted as such, without regard to the numerical limitations in this chapter.
 
 
 [2]
 Because we do not reach the question of whether Colorado law permits homosexual marriages, we need not examine the constitutionality of the statute. We observe, however, that an appeal challenging a Minnesota law which authorized heterosexual but not homosexual marriages was dismissed by the Supreme Court for want of a substantial federal question. See Baker v. Nelson, 291 Minn. 310, 191 N.W.2d 185 (1971), appeal dismissed, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 76 (1972), a case decided after Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), but before Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). "A summary dismissal by the Supreme Court of an appeal from a state court for want of a substantial federal question ... operates as a decision on the merits." Carpenters Pension Trust v. Kronschnabel, 632 F.2d 745, 747 (9th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 3159, 69 L.Ed.2d 1004 (1981). See Hicks v. Miranda, 422 U.S. 332, 334, 95 S.Ct. 2281, 2284, 45 L.Ed.2d 223 (1975)
 
 
 [3]
 Technically, the challenge to this construction of section 201(b) is based upon the equal protection "component" of the fifth amendment's due process clause. See Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). See also Richardson v. Belcher, 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971). The equal protection clause itself, a portion of the fourteenth amendment, applies only to the states, not the federal government
 
 
 [4]
 Adams and Sullivan contend that the right to marry is an intrinsic part of a constellation of personal rights variously described as rights of privacy and as components of substantive due process
 
 
 [5]
 In Zablocki v. Redhail, supra, a case involving a traditional heterosexual marriage, the Supreme Court stated that "the right to marry is of fundamental importance." 434 U.S. at 383, 98 S.Ct. at 679. See also Loving v. Virginia, supra, 388 U.S. at 12, 87 S.Ct. at 1824; Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942)