# In re Jose Mauricio LOVO-Lara, Beneficiary of a visa petition filed by Gia Teresa LOVO-Ciccone, Petitioner

File A95 076 067 - Nebraska Service Center

*Decided May 18, 2005*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)  The Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (1996), does not preclude, for purposes of Federal law, recognition of a marriage involving a postoperative transsexual, where the marriage is considered by the State in which it was performed as one between two individuals of the opposite sex.

(2)  A marriage between a postoperative transsexual and a person of the opposite sex may be the basis for benefits under section 201(b)(2)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1151(b)(2)(A)(i) (2000), where the State in which the marriage occurred recognizes the change in sex of the postoperative transsexual and considers the marriage a valid heterosexual marriage.

FOR PETITIONER:  Sharon M. McGowan, Esquire, New York, New York

FOR THE DEPARTMENT OF HOMELAND SECURITY:  Allen Kenny, Service Center Counsel

BEFORE:   Board Panel: GRANT, HESS and PAULEY, Board Members.

GRANT, Board Member:

In a decision dated August 3, 2004, the Nebraska Service Center ("NSC") director denied the visa petition filed by the petitioner to accord the beneficiary immediate relative status as her husband pursuant to section 201(b)(2)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1151(b)(2)(A)(i) (2000).  The petitioner has appealed from that decision.  The appeal will be sustained.

## I.  FACTUAL AND PROCEDURAL HISTORY

The petitioner, a United States citizen, married the beneficiary, a native and citizen of El Salvador, in North Carolina on September 1, 2002.  On November 20, 2002, the petitioner filed the instant visa petition on behalf of the beneficiary based on their marriage.  The record reflects that when the petitioner was born in North Carolina on April 16, 1973, she was of the male

sex. However, an affidavit from a physician reflects that on September 14, 2001, the petitioner had surgery that changed her sex designation completely from male to female.

In support of the visa petition, the petitioner submitted, among other documents, her North Carolina birth certificate, which lists her current name and indicates that her sex is female; the affidavit from the physician verifying the surgery that changed the petitioner's sex designation; a North Carolina court order changing the petitioner's name to her current name; the North Carolina Register of Deeds marriage record reflecting the marriage of the petitioner and the beneficiary; and a North Carolina driver's license listing the petitioner's current name and indicating that her sex is female.

On August 3, 2004, the NSC director issued his decision denying the instant visa petition. In support of his denial, the NSC director stated that defining marriage under the immigration laws is a question of Federal law, which Congress clarified in 1996 by enacting the Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (1996) ("DOMA"). Pursuant to the DOMA, in order to qualify as a marriage for purposes of Federal law, one partner to the marriage must be a man and the other partner must be a woman. In his decision the NSC director stated as follows:

> While some states and countries have enacted laws that permit a person who has undergone sex change surgery to legally change the person's sex from one to the other, Congress has not addressed the issue. Consequently, without legislation from Congress officially recognizing a marriage where one of the parties has undergone sex change surgery . . . , this Service has no legal basis on which to recognize a change of sex so that a marriage between two persons born of the same sex can be recognized.

The NSC director concluded that "since the petitioner and beneficiary were born of the same sex, their marriage is not considered valid for immigration purposes and the beneficiary is not eligible to be classified as the spouse of the petitioner under section 201(b) of the Act."

The petitioner filed a timely Notice of Appeal (Form EOIR-29) and subsequently filed a brief in support of her appeal. The Department of Homeland Security ("DHS") Service Center Counsel also filed a brief in support of the NSC director's decision.

## II. ISSUE

The issue presented by this case is whether a marriage between a postoperative male-to-female transsexual and a male can be the basis for benefits under section 201(b)(2)(A)(i) of the Act, where the State in which the marriage occurred recognizes the change in sex of the postoperative transsexual and considers the marriage valid.

## III.  ANALYSIS

In order to determine whether a marriage is valid for immigration purposes, the relevant analysis involves determining first whether the marriage is valid under State law and then whether the marriage qualifies under the Act.  *See Adams v. Howerton*, 673 F.2d 1036, 1038 (9th Cir. 1982).  The issue of the validity of a marriage under State law is generally governed by the law of the place of celebration of the marriage.  *Id.* at 1038-39.

In this case, the petitioner and the beneficiary were married in North Carolina.  Section 51-1 of the General Statutes of North Carolina provides that "[a] valid and sufficient marriage is created by the consent of a male and female person who may lawfully marry, presently to take each other as husband and wife, freely, seriously and plainly expressed by each in the presence of the other."  The terms "male" and "female" are not defined in the statute, but section 51-1 makes it clear by its terms that the State of North Carolina does not permit individuals of the same sex to marry each other.  *See also* N.C. Gen. Stat. § 51-1.2 (2004).

Section 130A-118 of the General Statutes of North Carolina governs the amendment of birth certificates.  That statute provides, in relevant part, as follows:

> A new certificate of birth shall be made by the State Registrar when:
> . . .
> (4)  A written request from an individual is received by the State Registrar to change the sex on that individual's birth record because of sex reassignment surgery, if the request is accompanied by a notarized statement from the physician who performed the sex reassignment surgery or from a physician licensed to practice medicine who has examined the individual and can certify that the person has undergone sex reassignment surgery.

N.C. Gen. Stat. § 130A-118(b)(4) (2004).

As noted above, the documents submitted by the petitioner reflect that she underwent sex reassignment surgery.  Consequently, the State of North Carolina issued her a new birth certificate that lists her sex as female and registered her marriage to the beneficiary, listing her as the bride.  In light of the above, we find that the petitioner's marriage to the beneficiary is considered valid under the laws of the State of North Carolina.  We also note that neither the NSC director nor the DHS counsel has asserted anything to the contrary on this point.

The dispositive issue in this case, therefore, is whether the marriage of the petitioner and the beneficiary qualifies as a valid marriage under the Act. Section 201(b)(2)(A)(i) of the Act provides for immediate relative classification for the "children, spouses, and parents of a citizen of the United States."  The Act does not define the word "spouse" in terms of the sex of the parties.  However, the DOMA did provide a Federal definition of the terms "marriage" and "spouse" as follows:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife.

DOMA § 3(a), 110 Stat. at 2419 (codified at 1 U.S.C. § 7 (2000)).

Neither the DOMA nor any other Federal law addresses the issue of how to define the sex of a postoperative transsexual or such designation's effect on a subsequent marriage of that individual. The failure of Federal law to address this issue formed the main basis for the NSC director's conclusion that this marriage cannot be found valid for immigration purposes. As stated above, the NSC director found that because Congress had not addressed the issue whether sex reassignment surgery serves to change an individual's sex, there was no legal basis on which to recognize a change of sex. Accordingly, he concluded that he must consider the marriage between the petitioner and the beneficiary to be a marriage between two persons of the same sex, which is expressly prohibited by the DOMA.

In determining the effect of the DOMA on this case, we look to the rules of statutory construction. The starting point in statutory construction is the language of the statute. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987); *INS v. Phinpathya*, 464 U.S. 183, 189 (1984). If the language of the statute is clear and unambiguous, judicial inquiry is complete, as we clearly "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). We find that the language of section 3(a) of the DOMA, which provides that "the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife," is clear on its face. There is no question that a valid marriage can only be one between a man and a woman. Marriages between same-sex couples are clearly excluded.

This interpretation is further supported by the legislative history of the DOMA. The House Report specifically states that the DOMA was introduced in response to a 1993 decision of the Hawaii Supreme Court that raised the issue of the potential legality of same-sex marriages in Hawaii. *See* H.R. Rep. No. 104-664, at 2-6 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905, 2906-10, 1996 WL 391835 (Leg. Hist.) (citing *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993) (remanding for application of strict scrutiny under the Hawaii equal protection clause to the question of the denial of marriage licenses to same-sex couples)). Throughout the House Report, the terms "same sex" and "homosexual" are used interchangeably. The House Report also repeatedly refers to the consequences of permitting *homosexual couples* to marry.

However, with regard to one of the specific issues we are facing in this case, i.e., whether the DOMA applies to invalidate, for Federal purposes, a marriage involving a postoperative transsexual, it is notable that Congress did

not mention the case of *M.T. v. J.T.*, 355 A.2d 204 (N.J. Super. Ct. App. Div. 1976), which recognized a transsexual marriage.[1]  Nor did it mention the various State statutes that at the time of consideration of the DOMA provided for the legal recognition of a change of sex designation by postoperative transsexuals.  Rather, Congress's focus, as indicated by its consistent reference to homosexuals in the floor discussions and in the House Report, was fixed on, and limited to, the issue of homosexual marriage.

Furthermore, a specific statement in the House Report's section-by-section analysis provides support for the conclusion that Congress did not consider transsexual marriages to be per se violative of the DOMA.  According to that statement, "*Prior to the Hawaii lawsuit*, no State has ever permitted homosexual couples to marry.  Accordingly, federal law could rely on state determinations of who was married without risk of inconsistency or endorsing same-sex 'marriage.'"  H.R. Rep. No. 104-664, at 30 (emphasis added).  As noted above, *M.T. v. J.T.*, *supra*, and the statutory provisions in several States recognizing a legal change of sex after surgery were in existence at the time the House Report was issued.

---

[1]  The case of *M.T. v. J.T.*, *supra*, was decided by the New Jersey Superior Court and involved a case where a wife had filed a complaint seeking support and maintenance from her husband.  Her husband responded with the defense that his wife was actually a male-to-female transsexual and therefore their marriage was void.  In rejecting his defense, the court upheld the validity of the marriage.  The court began its analysis by accepting the "fundamental premise . . . that a lawful marriage requires the performance of a ceremonial marriage of two persons of the opposite sex, a male and a female," and that New Jersey law would not permit recognition of a marriage between persons of the same sex.  *Id.* at 207. The court then directly confronted the issue "whether the marriage between a male and a postoperative transsexual, who has surgically changed her external sexual anatomy from male to female, is to be regarded as a lawful marriage between a man and a woman."  *Id.* at 208.  The court concluded that "for marital purposes if the anatomical or genital features of a genuine transsexual are made to conform to the person's gender, psyche or psychological sex, then identity by sex must be governed by the congruence of these standards."  *Id.* at 209.  On this basis, the court affirmed the finding of the trial court that the postoperative male-to-female transsexual was a female at the time of her marriage and entered into a valid marriage.  *Id.* at 211.

In 1977, the Department of Health, Education, and Welfare prepared a Model State Vital Statistics Act that specifically provided for the amendment of a birth certificate upon proof of a change of sex by surgical procedure in section 21(e).  *See In re Heilig*, 816 A.2d 68, 82-83 (Md. 2003).  By 1996, at the time of consideration of the DOMA, several States had enacted legislation patterned after section 21(e) to provide a mechanism for amending a person's birth certificate to reflect a change of sex upon submission of a court order recognizing a sex change by surgical procedure.  *See, e.g.*, Ariz. Rev. Stat. § 36-337 (2005) (previously at § 36-326); Cal. Health & Safety Code §§ 103425, 103430 (West 2005); Haw. Rev. Stat. § 338-17.7 (2003); La. Rev. Stat. Ann. § 40:62 (2004); Mich. Comp. Laws § 333.2831 (2005); Neb. Rev. Stat. § 71-604.01 (2004).  A recent review of State legislation indicates that 22 States and the District of Columbia have now enacted provisions specifically permitting legal recognition of changes of sex by postoperative transsexuals. *See In re Heilig*, *supra*, at 83 & n.8 (collecting the relevant statutory provisions).

We therefore conclude that the legislative history of the DOMA indicates that in enacting that statute, Congress *only* intended to restrict marriages between persons of the same sex. There is no indication that the DOMA was meant to apply to a marriage involving a postoperative transsexual where the marriage is considered by the State in which it was performed as one between two individuals of the opposite sex.[2]

There is also nothing in the legislative history to indicate that, other than in the limited area of same-sex marriages, Congress sought to overrule our long-standing case law holding that there is no Federal definition of marriage and that the validity of a particular marriage is determined by the law of the State where the marriage was celebrated. *See Matter of Hosseinian*, 19 I&N Dec. 453, 455 (BIA 1987). While we recognize, of course, that the ultimate issue of the validity of a marriage for immigration purposes is one of Federal law, that law has, from the inception of our nation, recognized that the regulation of marriage is almost exclusively a State matter. *See, e.g.*, *Boddie v. Connecticut*, 401 U.S. 371 (1971); *Sherrer v. Sherrer*, 334 U.S. 343 (1948).[3] Interestingly, with regard to this point, the House Report stated the following:

> If Hawaii or some other State eventually recognizes homosexual "marriage," Section 3 will mean simply that that "marriage" will not be recognized as a "marriage" for purposes of federal law. *Other than this narrow federal requirement*, the federal

---

[2] Our conclusion in this regard is consistent with an April 16, 2004, Interoffice Memorandum from William R. Yates, Associate Director for Operations of the United States Citizenship and Immigration Services ("CIS"), respecting the "Adjudication of Petitions and Applications Filed by or on Behalf of, or Document Requests by, Transsexual Individuals." That memorandum acknowledges that "neither the DOMA nor any other Federal statute addresses whether a marriage between (for example) a man and a person born a man who has undergone surgery to become a woman should be recognized for immigration purposes or considered invalid as a same-sex marriage."

[3] In deference to this fundamental aspect of our system of government, Federal statutes purporting to outlaw certain types of marriage are few and far between, and no Federal statute affirmatively authorizing a type of marriage appears to exist. Apart from the DOMA, the only other Federal statutory provisions purporting to outlaw certain types of marriage that our research has discovered are found at section 101(a)(35) of the Act, 8 U.S.C. § 1101(a)(35) (2000), which, in defining the terms "spouse," "husband," and "wife" for purposes of the Act, specifically excludes recognition of so-called proxy marriages "where the contracting parties thereto are not physically in the presence of each other, unless the marriage shall have been consummated," and in the Mann Act, which was construed by the Supreme Court to prohibit the interstate transportation of women for purposes of engaging in polygamy. *See Cleveland v. United States*, 329 U.S. 14 (1946); *see also* section 212(a)(10)(A) of the Act, 8 U.S.C. § 1182(a)(10)(A) (2000) (rendering inadmissible any immigrant coming to the United States to practice polygamy). Section 3(a) of the DOMA would also appear to have as an incidental effect the declaration of invalidity of polygamy, as it provides that "the word 'marriage' means only a legal union between *one man and one woman* as husband and wife." (Emphasis added.)

government will continue to determine marital status in the same manner it does under current law.

H.R. Rep. No. 104-664, at 31 (emphasis added). Therefore, we also conclude that Congress need not act affirmatively to authorize recognition of even an atypical marriage before such a marriage may be regarded as valid for immigration purposes, assuming that the marriage is not deemed invalid under applicable State law.[4]

The DHS counsel appears to argue that in determining whether a particular marriage is valid under the DOMA, we must look to the common meanings of the terms "man" and "woman," as they are used in the DOMA. Counsel asserts that these terms can be conclusively defined by an individual's chromosomal pattern, i.e., XX for female and XY for male, because such chromosomal patterns are immutable. However, this claim is subject to much debate within the medical community. According to medical experts, there are actually eight criteria that are typically used to determine an individual's sex. They are as follows:

1. Genetic or chromosomal sex – XX or XY;
2. Gonadal sex – testes or ovaries;
3. Internal morphologic sex – seminal vesicles/prostate or vagina/uterus/fallopian tubes;
4. External morphologic sex – penis/scrotum or clitoris/labia;
5. Hormonal sex – androgens or estrogens;
6. Phenotypic sex (secondary sexual features) – facial and chest hair or breasts;
7. Assigned sex and gender of rearing; and
8. Sexual identity.

*See* Julie A. Greenberg, *Defining Male and Female: Intersexuality and the Collision Between Law and Biology*, 41 Ariz. L. Rev. 265, 278 (1999). While most individuals are born with 46 XX or XY chromosomes and all of the other factors listed above are congruent with their chromosomal pattern, there are certain individuals who have what is termed an "intersexual condition," where some of the above factors may be incongruent, or where an ambiguity within a factor may exist. *Id.* at 281. For example, there are individuals with a chromosomal ambiguity who do not have the typical 46 XX or XY chromosomal pattern but instead have the chromosomal patterns of XXX, XXY, XXXY, XYY, XYYY, XYYYY, or XO. *Id.* Therefore, because a chromosomal pattern is not always the most accurate determination of an individual's gender, the DHS counsel's reliance on chromosomal patterns as the ultimate determinative factor is questionable.

---

[4] This conclusion is entirely consistent with *Adams v. Howerton*, *supra*, relied on by the DHS. In that case, the court held that even if a homosexual marriage between an American citizen and an alien was valid under Colorado law, the parties were not "spouses" under section 201(b) of the Act. The court reached its result through an interpretation of section 201(b) itself and the term "spouse" as used therein, not by finding a general Federal public policy against the recognition of such marriages.

Moreover, contrary to the suggestion of the DHS counsel, reliance on the sex designation provided on an individual's original birth certificate is not an accurate way to determine a person's gender.[5] Typically, such a determination is made by the birth attendant based on the appearance of the external genitalia. However, intersexed individuals may have the normal-appearing external genitalia of one sex, but have the chromosomal sex of the opposite gender. *Greenberg*, *supra*, at 283-92. Moreover, many incongruities between the above-noted factors for determining a person's sex, and even some ambiguities within a factor, are not discovered until the affected individuals reach the age of puberty and their bodies develop differently from what would be expected from their assigned gender. *Id.* at 281-92.

We are not persuaded by the assertions of the DHS counsel that we should rely on a person's chromosomal pattern or the original birth record's gender designation in determining whether a marriage is between persons of the opposite sex. Consequently, for immigration purposes, we find it appropriate to determine an individual's gender based on the designation appearing on the current birth certificate issued to that person by the State in which he or she was born.

## IV.  CONCLUSION

We have long held that the validity of a marriage is determined by the law of the State where the marriage was celebrated. The State of North Carolina considers the petitioner to be a female under the law and deems her marriage to the beneficiary to be a valid opposite-sex marriage. We find that the DOMA does not preclude our recognition of this marriage for purposes of Federal law. As the NSC director did not raise any other issues regarding the validity of the marriage, we conclude that the marriage between the petitioner and the beneficiary may be the basis for benefits under section 201(b)(2)(A)(i) of the Act. Accordingly, the petitioner's appeal will be sustained, and the visa petition will be approved.

**ORDER:**  The petitioner's appeal is sustained, and the visa petition is approved.

---

[5]  We note that there could be anomalous results if we refuse to recognize a postoperative transsexual's change of sex and instead consider the person to be of the sex determined at birth in accordance with the DHS's suggestion. For example, the marriage of a postoperative male-to-female transsexual to a female in a State that recognizes marriages between both opposite-sex and same-sex couples would be considered valid, not only under State law, but also under Federal law, because, under the DHS's interpretation, the postoperative transsexual would still be considered a male, despite having the external genitalia of a female.