**FOREST GUARDIANS, et al., Plaintiffs,**

v.

**Jack Ward THOMAS, in his official capacity as Chief, United States Forest Service, Defendant.**

**No. CIV. 96–2258 PHX–PGR.**

United States District Court,
D. Arizona.

June 25, 1997.

Mark Edward Hughes, Earthlaw, University of Denver, Denver, CO, Steven Sugar-

**1538**

man, Sante Fe, NM, for Forest Guardians, Southwest Center for Biological Diversity and Dr. Robin Silver.

Michael A. Johns, U.S. Attorney's Office, Phoenix, AZ, Joel Armstrong, U.S. Department of Justice, Environment & Natural Resources Div., Washington, DC, for Jack Ward Thomas.

John D. Everroad, Robert Daniel Anderson, David Michael Call, Fennemore Craig, Phoenix, AZ, for Stone Container Corp.

Richard A. Segal, James G. Speer, Gust Rosenfeld PLC, Phoenix, AZ, Alan I. Saltman, Gary G. Stevens, Richard W. Goeken, Saltman & Stevens, Washington, DC, for Precision Pine & Timber Inc.

Richard Rosenstock, Santa Fe, NM, for La Compania Ocho Inc., Manuel Guruel, Antonio DeVargas, Pat Valdez, Steve Chavez and Dennis Valdez.

### ORDER

ROSENBLATT, District Judge.

I. *BACKGROUND*

 *A. General history* [1]

 *1. Southwestern Region Amendment*

In 1976, Congress enacted the National Forest Management Act ("NFMA"). The NFMA constitutes a statutory framework pursuant to which the Secretary of Agriculture is to plan for the management of National Forest lands. 16 U.S.C. §§ 1600–1614. The statute provides for public participation in this forest planning process. 16 U.S.C. § 1604(d). NFMA also provides that land and resource management planning is to provide for multiple uses and sustained yield of the various forest resources on a coordinated basis. 16 U.S.C. § 1604(e). It further directs the Secretary to use a systematic, interdisciplinary approach to forest planning so as to achieve integrated consideration of

physical, biological, economic, and other sciences. 16 U.S.C. § 1604(b).

The statute establishes a scheme for development of Land and Resource Management Plans ("LRMPs" or "forest plans") for units of the National Forest System. A unit is a specific forest within a particular region of the National Forest System. For example, Arizona and New Mexico constitute Region 3, the Southwestern Region. The six national forests in Arizona [2] and the five national forests in New Mexico [3] constitute 11 separate units within Region 3. 36 C.F.R. § 200.2.

The forest plans for the Southwestern Region forests were completed between 1985 and 1988. The Mexican spotted owl was listed as a threatened species effective April 15, 1993. In March, 1995, the United States Fish and Wildlife Service ("F & W") prepared and released for public and agency review a draft Mexican Spotted Owl Recovery Plan ("MSORP"). The completion of the MSORP and the Record of Decision's ("ROD") final Environmental Impact Statement ("EIS") were coordinated to facilitate incorporation of the final recommendations in the ROD.

In 1990 the Regional Forester established a Task Force and a separate Scientific Committee to review northern goshawk habitat management needs. The Scientific Committee issued their final management recommendations for northern goshawk habitat management guidelines in November, 1991. Interim guidelines were issued, the most recent of which expired in June, 1995. In order to ensure the continued protection of the northern goshawk until a final decision on the amendment, permanent northern goshawk guidelines were added to the Forest Service Directive System as a Region 3 Supplement in June, 1995.

While the forest plans in existence recognized both species as being sensitive species and therefore provided emphasis for their protection, the plans contained few specific

---

**1.** The details of the general history are taken from the parties' briefs submitted in relation to the various motions pending in this matter, including excerpts from exhibits attached to these briefs.

**2.** These forests are the Apache–Sitgreaves, Coconino, Coronado. Kaibab, Prescott, and Tonto. 36 C.F.R. § 200.2.

**3.** These forests are the Carson, Cibola, Gila, Lincoln and Santa Fe. 36 C.F.R. § 200.2.

standards and guidelines for their protection. In July, 1993, the plans were reviewed to identify standards and guidelines that should be revised to include the habitat needs for the northern goshawk and the Mexican spotted owl. Each forest plan was updated to contain the latest information on habitat needs for those species.

On June 6, 1996, the Regional Forester signed the ROD for the region-wide Amendment of all eleven LRMPs for the forests of the Southwestern Region. The ROD's objectives are as follows:

—incorporate standards and guidelines for Mexican spotted owl and northern goshawk into the Southwestern Region's forest plans to guide site-specific project design until forest plans are revised (1996 to 2003).

—incorporate standards and guidelines for old growth to ensure compatibility with requirements for Mexican spotted owl and northern goshawk and to ensure consistency across the Southwestern Region.

—ensure standards and guidelines reflect the de-emphasis from even-aged management silviculture and better represent current forest management.

—ensure standards and guidelines reflect the de-emphasis of timber production from slopes over 40 percent.

—ensure standards and guidelines for the Mexican spotted owl are consistent with the MSORP.

—ensure standards and guidelines for grazing management are added to all forest plans.

*See* Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ("Response"),

pg. 8. Each of the Southwestern Region's LRMPs are scheduled for revision beginning in 1996.

### 2. The La Manga Timber Sale

In late 1989, La Compania Ocho, Inc. ("La Compania") was organized by Manuel Guruel, Antonio DeVargas, Pat Valdez, Steve Chavez and Dennis Valdez to create business and employment opportunities for residents of the Vallecitos Federal Sustained Yield Unit ("Vallecitos Unit.")[4] on a federally created land management area located within the Carson National Forest in and around the village of Vallecitos, New Mexico. In an effort to address some of the economic and social afflictions affecting timber dependent rural communities throughout the United States, Congress passed the Sustained Yield Forest Management Act of 1944, 16 U.S.C. § 583 *et seq.* This law authorized the Secretary of Agriculture to establish administratively a sustained yield unit within the National Forest when such an action would be "in the public interest."

. . . .

The creation of a Sustained Yield Unit is "in the public interest" and authorized to be created upon a determination by the Secretary of Agriculture that the maintenance of stable communities is primarily dependent upon the sale of timber or other forest products from federally owned or administered forest land and that such maintenance cannot effectively be secured by following the usual procedures, including competitive bidding, in selling such timber or other forest products. The express purpose behind the establishment of a Sustained Yield Unit is to benefit

---

4. "Unit", as used in the context of the Sustained Yield Forest Management Act, is defined in the statute:

> In order to promote the stability of forest industries, of employment, of communities, and of taxable forest wealth, through continuous supplies of timber; in order to provide for a continuous and ample supply of forest products, and in order to secure the benefits of forests in maintenance of water supply, regulation of stream flow, prevention of soil erosion, amelioration of climate, and preservation of wildlife, the Secretary of Agriculture and the Secretary of the Interior are severally authorized to establish by formal declaration, when

> in their respective judgments such action would be in the public interest, *cooperative sustained-yield units which shall consist of federally owned or administered forest land under the jurisdiction of the Secretary establishing the unit and, in addition thereto, land which reasonably may be expected to be made the subject of one or more of the cooperative agreements with private landowners authorized by section 583a of this title.*

16 U.S.C. § 583 (emphasis added). This definition should not be confused with the use of the term "unit" under the NFMA, which refers to a specific forest within a particular Region.

those specific communities designated as part of a Unit by maintaining community stability through the strengthening of the economic structure of these communities by providing permanent, continuous, ample and sustained supply of forest products, including sawtimber. 16 U.S.C. §§ 583, 583b.

Once the Secretary of Agriculture makes a decision to establish a sustained yield unit, the Secretary first must determine and define the boundaries of the community or communities for whose benefit the unit was created. Secondly, the Secretary must sell, subject to such conditions and requirements as he believes necessary, federally owned timber and other forest products from the Unit to responsible purchasers within the benefitted communities. 16 U.S.C. § 583b.

Pursuant to the Sustained Yield Forest Management Act, the Department of Agriculture issued regulations regarding the sale of sawtimber within the sustained yield units. The Chief of the Forest Service was authorized to offer National Forest timber for sale without competition to "responsible operators" within those communities designated as the benefitted communities. Additionally, the Chief was authorized to offer such timber for sale without competition to other "responsible operators" who would agree to manufacture the timber within the communities to be maintained by the Unit. 36 C.F.R. § 223.117(b).

From 1990 to 1994, La Compania worked as a subcontractor for Duke City Lumber company, a subsidiary of a large international company. In March, 1994, La Compania filed suit against the United States Forest Service alleging it had been denied the opportunity to obtain its own timber sales contracts from 1990–94 in retaliation for engaging in conduct protected by the First Amendment and/or because of racial animus. *See La Compania Ocho, Inc. v. U.S. Forest Service,* 874 F.Supp. 1242 (D.N.M.1995). On March 13, 1996, a settlement agreement and Order was entered by United States District Judge John Conway giving La Compania the

right to purchase 75% of the 2.1 million board feet ("MMBF") La Manga Timber Sale ("La Manga Sale"), as then configured. The La Manga Sale lies within the Vallecitos Federal Sustained Yield Unit and the primary purpose behind the Sale is to fulfill the Sustained Yield Forest Management Act by providing sawtimber sales to Vallecitos Unit residents. Because of the conduct of both Forest Guardians and the U.S. Forest Service, La Compania was not able to purchase the sale until January 1997. *See Forest Conservation Council et al. v. Glickman,* CIV No. 94–931 M (D.N.M.).[5] In January 1997, La Compania formally signed a contract with the Forest Service to purchase the first 1.0 MMBF from the La Manga Sale. Because of weather conditions, no work has been done yet on the sale.[6] The injunction issued by the Ninth Circuit Court of Appeals in this matter now prohibits the logging on the La Manga Sale.

In August, 1994, the Forest Conservation Council, the Carson Forest Watch, Forest Guardians and the National Audubon Society filed suit in the United States District Court of New Mexico, seeking to enjoin the La Manga Sale on the grounds that it violated the National Environmental Policy Act ("NEPA") of 1969 and the NFMA. *See Forest Conservation Council, et al., v. Glickman,* CIV No. 94–931 M (D.N.M.). In February, 1996, La Compania was allowed to intervene, over the opposition of the plaintiffs. At the time La Compania intervened, virtually nothing had been done in the case by plaintiffs and in September, 1996, Senior United States District Judge Mechem ordered plaintiffs to file dispositive motions. In October, 1996, plaintiffs added claims in the Pretrial Order alleging that the La Manga Sale violated the June, 1996 ROD and the Forest Service was required to prepare a Supplemental Environmental Impact Statement ("SEIS"). Specifically, the plaintiffs alleged the following, captioned as contested material facts:

---

5. The history of this case will be discussed *infra.*

6. Apparently the weather conditions had lifted at the time the parties presented their arguments to

the Ninth Circuit Court of Appeals in this matter. No party ever informed this Court that logging had begun on the La Manga Sale.

u. On December 4, 1995 the Forest Service completed and released to the public its final environmental impact statement on proposed amendments to the forest plans for all national forests in the Southwest Region, including the Carson National Forest. The final environmental impact statement addressed amendments to the forest plans that change current management of the Mexican spotted owl, northern goshawk, old growth forests, and grazing throughout the Region. The final environmental impact statement for the forest plan amendments includes new information that documents the adverse effects of existing forest management and forest plans on the Mexican spotted owl, the northern goshawk, and old growth dependent species. In addition, the environmental impact statement documents that only four percent of the existing mixed conifer and ponderosa pine forests in the Region qualify as old growth forests. Finally, that environmental impact statement also indicates that existing forest plans are not adequate to maintain viable populations of these species.

v. On June 5, 1996, the Forest Service adopted a record of decision amending forest plans throughout the Southwest Region, including the Carson National Forest Plan, to incorporate new standards and guidelines for management of the Mexican spotted owl, its habitat, the northern goshawk, and old growth forests. This record of decision requires extensive new protection for forests in the La Manga timber sale area as well as new analysis of the environmental impacts of that sale before the timber can be offered for sale.

See La Compania's Amicus Curiae Brief, Exhibit 5, pg. 14. Plaintiffs later abandoned these NFMA claims; the only NFMA claim decided by Judge Mechem of the new claims listed in the Pretrial Order was whether the decision to conduct the La Manga sale was made without adequate information in violation of NFMA. See La Compania's Amicus Curiae Brief, Exhibit 7, pp. 11–12.

On January 29, 1997, Judge Mechem entered a Memorandum Opinion and Order denying plaintiffs' Motion for Summary Judgment, finding that the Forest Service did not abuse its discretion in failing to prepare a SEIS in light of the information contained in the ROD and the documentation noted prior to the ROD. See La Compania's Amicus Curiae Brief, Exhibit 6. On May 5, 1997, that court entered another Memorandum Opinion and Order denying all of plaintiffs' NEPA and NFMA claims regarding the La Manga Timber Sale. Id. Exhibit 7. The court entered final judgment, dismissing plaintiffs' case. Plaintiffs did not file any motion before the New Mexico district court for reconsideration or stay pending appeal, nor did they file an appeal with the Tenth Circuit Court of Appeals.

### 3. The Silver v. Thomas case [7]

Another case which involved the La Manga Sale was filed in this District in 1994. On February 14, 1994, Robin Silver, Forest Guardians and Southwest Center for Biological Diversity, among others, filed a complaint for declaratory and injunctive relief against Bruce Babbitt as Secretary of the Interior and the Director of the United States Fish and Wildlife Service. See Silver, et al. v. Babbitt, et al., CIV 94–337 PHX RGS. The case was originally assigned to Judge C.A. Muecke, and claimed that Defendants were violating the Endangered Species Act ("ESA").

On August 9, 1994, Robin Silver, Forest Guardians and Southwest Center for Biological Diversity, among others, filed a complaint for declaratory and injunctive relief against Jack Thomas as Chief of the United States Forest Service, the United States Forest Service, the Assistant Secretary of the Interior for Indian Affairs and the Bureau of Indian Affairs. See Silver, et al. v. Thomas, et al., CIV 94–1601 PHX RGS. The case was originally assigned to Judge Earl H. Carroll, and claimed that Defendants were violating the ESA by failing to submit on-going LRMPs for all Region 3, i.e. Southwestern

---

7. This history of the Silver case is very concise and only highlights major orders entered by the court. The docket sheet in the Silver case is over 51 pages long, and to relate the entire history of the case, including all pending motions and decisions, would take far longer than this Court feels is necessary to relate the information pertinent to this matter.

Region, forests to the F & W for consultation.

Plaintiffs and defendants then filed a Motion to Transfer *Silver v. Thomas* to Judge Muecke, as the issues, etc. were the same as those raised in *Silver v. Babbitt.* The motion was granted on September 22, 1994 by Judge Muecke, and *Silver v. Thomas* was transferred to Judge Muecke. *See* Order, Doc. # 8 in *Silver v. Thomas.*

Initially Judge Muecke entered an order suspending all timber harvest activities. On October 19, 1995, plaintiffs entered into a settlement agreement with the Forest Service to suspend all projects involving the cutting of trees in Region 3 until certain consultations were completed. On May 3, 1996, Judge Muecke granted plaintiffs' motion for order finding that consultation on the existing forest plans were not complete. Defendants had filed a "biological opinion" in April which they unilaterally determined to be sufficient to comply with the consultations order by Judge Muecke. Judge Muecke found that opinion to be insufficient to terminate consultation. *See* Order, Doc. # 360.

On July 12, 1996, Judge Muecke lifted the injunction with respect to tree-cutting activities on Mount Graham in order to comply with orders entered in other lawsuits involving Mount Graham.[8] On July 22, 1996, Judge Muecke entered an order putting defendants on notice that the injunction was still in place, and expediting briefing on plaintiffs' motion for order finding consultation not complete. *See* Order, Doc. # 404.

On September 20, 1996, Judge Muecke entered an order finding that the biological opinions issued by the defendants were not sufficient on their face and setting new timetables by which defendants had to provide sufficient biological opinions. *See* Order, Doc. # 429.

On October 1, 1996, an Emergency Motion for leave to advertise the La Manga Timber Sale to Comply with Judge Mechem's Order

was filed by defendants. The motion asserted that Judge Mechem had found the injunction issued in the *Silver* matter not to apply to the La Manga Timber Sale, despite the clear order of Judge Muecke that the injunction applied to all forests and projects within the Southwestern Region, which includes the La Manga Timber Sale. *See* Motion, Doc. # 436. The Forest Service could not comply with both the injunction issued in relation to the entire Southwestern Region and the order to advertise the La Manga Timber Sale, which is within the Southwestern Region. *Id.* Judge Muecke recused himself before a resolution of this motion. The case ultimately was assigned to Judge Roger G. Strand. Another motion for leave to advertise the La Manga sale was filed by defendants. The parties ultimately entered into a stipulation allowing the advertisement of the La Manga Timber Sale, but still prohibiting any logging on the sale. *See* Stipulation, Doc. # 454. Judge Strand accepted the stipulation and the La Manga sale was advertised.

The parties ultimately settled the matter and agreed that the consultation was complete. *See* Minute Entry, Doc. # 465. The injunction was terminated on December 6, 1996.

. . . .

. . .

**B. Procedural background of this matter**

On October 1, 1996, Plaintiffs Forest Guardians, Southwest Center for Biological Diversity and Dr. Robin Silver ("Plaintiffs") filed a complaint for declaratory and injunctive relief against Defendant Jack Ward Thomas[9] ("Defendant"), Chief of the United States Forest Service. Plaintiffs claimed in their complaint that Defendant was violating the NFMA, 16 U.S.C. § 1600, *et seq.* Plaintiffs claimed that the Forest Service had adopted new Forest Plans in relation to 11 national forests in Arizona and New Mexico,

---

8. Numerous lawsuits were filed in relation to the building of a binocular telescope on Mount Graham. The Court will not relay the history of the Mount Graham case, but notes the existence of those lawsuits in order to clarify Judge Muecke's order allowing cutting in that area.

9. Since the filing of this lawsuit, Mr. Thomas has been replaced by Mike Dombeck as Chief of the United States Forest Service. Therefore, any reference to Defendant will be a reference to the Chief of the United States Forest Service, in this case now Mr. Dombeck.

but that Defendant had issued a statement indicating that he would not implement the new Forest Plan in relation to projects which existed prior to the adoption of the new Forest Plans. Plaintiffs contended that 26 unsold timber contracts needed to be reconfigured in order to comply with the NFMA, but that Defendant was failing to do so. Plaintiffs' sole relief in the complaint was declaratory and injunctive relief, as none of the 26 timber sales in question had actually been sold, nor were these sales actually to be logged.

On December 27, 1996, Plaintiffs filed an amended complaint for declaratory and injunctive relief, contending that Defendant intended to proceed with 240 projects which did not comply with the NFMA. Again, Plaintiffs sought declaratory and injunctive relief to prevent any implementation of these projects, but acknowledged that no actual logging or other activity was occurring at that time with respect to the projects in question.

Plaintiffs filed a Motion for Summary Judgment, as well as a Motion for Preliminary Injunction on December 27, 1996. Plaintiffs claimed that only one legal issue existed in the case—the application of the NFMA to the undisputed facts of the case. The Motion for Preliminary Injunction was a reiteration of the Motion for Summary Judgment, in that it requested that this court enjoin the implementation of all forest management activities not consistent with the New Forest Plans and enjoin all future authorizations for the use and/or occupancy of national forest lands not consistent with the Forest Plans. Neither the Motion for Summary Judgment, nor the Motion for Preliminary Injunction, indicated that any logging projects were proceeding or that any emergency existed which warranted expeditious consideration of Plaintiffs' claims. All language in both motions refers to actions of the Defendant in the future.

On January 13, 1997, Defendant filed an Emergency Motion to Stay Plaintiffs' Motion for Preliminary Injunction and for an Extension of Time to Respond to Plaintiffs' Motion for Summary Judgment. Defendant indicated that the Motion for Summary Judgment would be dispositive of the entire case, and that rather than brief two motions, the motion for preliminary injunction should be stayed pending resolution of the Motion for Summary Judgment. Defendant also noted that a case pending in the United States District Court for the District of New Mexico, *Forest Conservation Council v. Glickman,* Civ. No. 94–931–M (D.N.M.), involved a specific timber sale in the area in question pending in this matter, the La Manga timber sale, and that the intervenors in that case, La Compania, had filed a Motion for Order Enjoining Plaintiff Forest Guardians from Proceeding to Litigate in the Arizona District Court. Based upon the record presented to the court by the parties. the court, believing that the issues in this matter could be resolved via summary judgment, and believing that no actual logging was taking place, granted Defendant's motion and stayed the Motion for Preliminary Injunction.

On January 30, 1997, Plaintiffs filed a Motion to Reconsider Stay of Preliminary Injunction Motion. Plaintiffs for the first time indicated in their motion to reconsider that logging was taking place in certain areas within Arizona and New Mexico. Despite this indication that such logging was taking place, Plaintiffs did not seek immediate emergency relief, but merely requested that the court not indefinitely stay the consideration of the motion for preliminary injunction. Plaintiffs requested that the court require a response to the motion for preliminary injunction two weeks after the Motion for Summary Judgment was fully briefed.

On February 5, 1997, the court received Stone Container Corporation's Motion to Intervene. On February 12, 1997, Defendant filed his response to Plaintiff's Motion for Summary Judgment. Defendant asked that Plaintiffs' Motion for Summary Judgment be denied and that summary judgment be entered in his favor. In the statement of facts attached to Defendant's response, Defendant indicated that of the logging operations referred to by Plaintiff in its Motion to Reconsider, most were not in operation. *See* Defendant's Response, Exhibit 2, Affidavit of Milo J. Larson. Defendant also indicated that two of the logging operations were oper-

ating under the parameters of the stipulated injunction issued in the *Silver v. Thomas* case, CIV 94–1610 PHX–RGS (consolidated with *Silver v. Babbitt*, CIV 94–337 PHX–RGS). Plaintiffs were also plaintiffs in the *Silver* cases. Thus, according to Defendant's response. there were no logging operations except for the two which were operating in accordance with a stipulated injunction issued in a case which Plaintiffs were party to.

Plaintiffs filed their reply to the Motion for Summary Judgment on March 3, 1997. Plaintiffs did not oppose or contradict any of the statements made by Defendant in his response with respect to the status of logging operations. Plaintiffs provided an affidavit countering Defendant's assertions that the logging operations in question complied with the NFMA, but did not counter the assertions that there were currently no logging operations. In their reply, Plaintiffs responded to Defendant's legal arguments related to the issue of revision vs. amendment under the NFMA, but Plaintiffs did not indicate any logging was currently occurring, or that any expedited consideration of the motion need be taken due to any pending logging operations.

Stone Container Corporation then filed a Motion for Summary Ruling, indicating that no party had responded to its motion to intervene. On the same day, Defendant filed a Motion for Leave to File Supplemental Memorandum and Supplemental Memorandum. Defendant contended that Plaintiffs raised a new issue in their reply with respect to the Defendant's position in relation to the consistency provisions of the NFMA. Plaintiffs then filed a Response to the Supplemental Memorandum rather than a response to the Motion for Leave to File a Supplemental Memorandum.

The court, believing that all pending motions were briefed, and further believing that no logging operations were being utilized based upon the record provided by the parties, submitted the motion for summary judgment and all other pending motions, which were dependent upon the motion for summary judgment, to be decided in the due course of business. The court assumed that the start or resumption of any logging operations would result in an immediate request from Plaintiffs for a temporary restraining order or an expeditious ruling on the motion for summary judgment.[10]

On May 15, 1997, Plaintiffs filed a Motion of Appeal to the Ninth Circuit Court of Appeals. Plaintiffs were apparently appealing the "denial" by this court of their Motion for Preliminary Injunction. On May 27, 1997, Stone Container Corporation filed an Emergency Request for a Ruling on Stone's Motion to Intervene and the Cross–Motions for Summary Judgment, asking the court to rule on the pending motion for summary judgment to prevent Plaintiffs from "forum-shopping" and from wasting valuable judicial resources, as well as the resources of the parties.

On May 30, 1997, the Ninth Circuit Court of Appeals issued the following Order:

> We construe Forest Guardian's emergency motion as an emergency petition for a writ of mandamus. The Clerk shall open a new docket treating this case as a mandamus action. Petitioners' request for emergency injunctive relief is granted to the extent that *no new logging including logging pursuant to the La Manga Timber Sale,* shall occur pending further order of this court. The temporary injunctive relief we grant in this order is intended to prevent any irreparable harm to the forests pending the district court's consideration, in the first instance, of the request for preliminary injunctive relief now pending before it. The district court is requested to address that request as expeditiously as possible.
>
> In view of the above, we dismiss the interlocutory appeal as well as all other pending motions as moot. The mandate shall issue forthwith.

(emphasis added). Thus, the Ninth Circuit Court of Appeals acknowledged that *no* decision had been entered with respect to the motion for preliminary injunction. This order was the first time this court was made aware of any new logging or that a logging

---

**10.** It should be noted that the motion for prelimi- nary injunction was never briefed.

operation known as the La Manga Timber Sale was in the process of being logged.

On June 4, 1997, Defendant filed a response to the Motion for Preliminary Injunction. Defendant also requested expedited briefing on the motion for preliminary injunction. On June 6, 1997, Plaintiffs filed an overlength reply in support of the motion for preliminary injunction which also contained arguments in relation to the motion for summary judgment. Because the reply was filed within two days of Defendant's request for expedited briefing, the court did not rule on the motion as it was moot.

La Compania filed an amicus curiae brief on June 6, 1997, as well as a motion to appear as amicus. Also on June 6, 1997, Precision Pine & Timber, Inc. ("Precision") filed a Motion to Intervene, to Appear as Amicus Curiae, and for Accelerated Briefings and Hearings. The court entered an Order requiring expedited briefing on the Motion to Intervene. Defendant did not take a position with respect to the motion to intervene, nor did it file any opposition to the motion to appear as amicus filed by La Compania. Plaintiffs filed a response to the motion to intervene filed by Precision, indicating they objected to Precision's intervention, but not to its appearance as amicus. Plaintiffs did not file any response to the motion to appear as amicus filed by La Compania.

## II. *DISCUSSION*

### A. *Motion to Intervene; related motions*

Stone Container Corporation has filed an unopposed Motion to Intervene. For good cause appearing, and because no objection has been filed thereto, the court will grant the motion. The Motion for Summary Ruling filed by Stone Container Corporation (hereinafter "Intervenor") is denied as moot.

It is apparent from Intervenor's Emergency Request for a Ruling on Stone's Motion to Intervene and the Cross–Motions for Summary Judgment ("Request") that Intervenor believes its interests are fully represented in the memoranda prepared and filed by Defendant in this action. The Request specifically asks this court to rule on the motions for summary judgment prior to any decision from the Ninth Circuit Court of Appeals on the then pending appeal. The Request does not seek an extension of time to allow Intervenor to file any documents in opposition to the Motion for Summary Judgment, thus demonstrating Intervenor's belief that the Defendant's arguments adequately represent the position of Intervenor. Therefore, the court will proceed with a decision on the Motion for Preliminary Injunction and the Motion for Summary Judgment without any additional briefing from Intervenor. Intervenor's Request for Summary Ruling is also denied as moot.

### B. *Motions to appear as amicus curiae*

La Compania has filed a motion to appear as amicus curiae, and has also filed a brief in opposition to the motion for preliminary injunction. For good cause appearing, and no objection having been filed thereto, the court will allow La Compania to appear as amicus in this matter. The court will therefore consider La Compania's brief in its consideration of the motion for preliminary injunction.

Precision has also filed a Motion to Intervene, to File Amicus Curiae Brief and for Accelerated Briefings and Hearings. Precision is a small forest products company which claims it has suffered economically due to the injunction entered by the Ninth Circuit Court of Appeals in this matter. Plaintiffs do not oppose Precision being allowed to appear as amicus in this matter, but opposes any grant of intervenor status. In order to expedite this matter, the court will grant Precision amicus curiae status and will consider its presentation of evidence in relation to the motion for preliminary injunction. Precision's motion is denied in all other respects.

### C. *Motion for Preliminary Injunction*

Plaintiffs seek a preliminary injunction to enjoin: "(1) the implementation of all forest management activities that are not consistent with the new Forest Plans as described in Alternative G of the Environmental Impact Statement ('ELS') for the Forest Plan amendments and (2) preliminarily enjoin all future authorizations for the use and/or occupancy of national forest lands that are not

consistent with the new Forest Plans as described in Alternative G of the EIS." *See* Memorandum Brief in Support of Plaintiffs' Motion for Preliminary Injunction. Based upon the injunction entered by the Ninth Circuit Court of Appeals and the amici brief filed in relation to this issue, it also appears that this court must specifically examine the La Manga Timber Sale in light of arguments that the La Manga sale cannot be enjoined based upon principles of res judicata.

Plaintiffs have filed an overlength brief as their reply in support of their Motion for Preliminary Injunction, as well as a Motion to Extend Page Limit. By Plaintiffs' own admission, the reply does not only address the issue of preliminary injunction, but also provides argument and evidence in support of Plaintiffs' Motion for Summary Judgment. Despite this inappropriate method of having another opportunity to provide argument in relation to the motion for summary judgment, which is fully briefed, the court will allow the reply to be filed and will consider the arguments and evidence contained therein in relation to the motion for preliminary injunction and to the extent applicable to the motion for summary judgment.

### 1. Standard

█ A plaintiff is entitled to a preliminary injunction when he or she demonstrates *either* (1) a combination of probable success on the merits *and* the possibility of irreparable injury *or* (2) the existence of serious questions going to the merits *and* that the balance of hardships tips sharply in his or her favor. *See Sardi's Restaurant Corp. v. Sardie,* 755 F.2d 719, 723 (9th Cir.1985); *International Jensen, Inc. v. Metrosound U.S.A.,* 4 F.3d 819, 822 (9th Cir.1993).

### 2. The La Manga sale

Defendant and La Compania claim that Plaintiffs' request for injunctive relief with respect to the La Manga sale must be denied because it is barred by the doctrine of res judicata. Plaintiffs contend that res judicata does not bar their claim because they are seeking Region-wide relief, not just relief for the La Manga timber sale. Additionally, Plaintiffs claim the issue has already been litigated and rejected by Judge Mechem, and

that the plaintiffs in the New Mexico case are not the same as Plaintiffs in this case.

The court can immediately reject Plaintiffs' first claim that because they are seeking Region-wide relief, there is no need to address res judicata as to the La Manga sale. While the court acknowledges that the amended complaint and motion for summary judgment specifically address only application of the ROD to the entire Southwestern Region, it is clear that Plaintiffs used the site-specific La Manga sale in order to convince the Ninth Circuit Court of Appeals that injunctive relief was necessary. *See* Order dated May 30, 1997 in Ninth Circuit Court of Appeals case No. 97–15905 ("Petitioners' request for emergency injunctive relief is granted to the extent that no new logging, *including logging pursuant to the La Manga Timber Sale,* shall occur pending further order of this court."). Thus, the court must address the site-specific contentions of La Compania involving res judicata.

█ Res judicata analysis requires consideration of the following:

The doctrine of claim preclusion (res judicata) provides that a final judgment on the merits bars a subsequent action between the same parties or their privies over the same cause of action.... " The judgment prevents litigation of all grounds and defenses that were or could have been raised in the action." ...

*In re Imperial Corp. of America,* 92 F.3d 1503, 1506 (9th Cir.1996) (citations omitted). The central question in a res judicata analysis is whether the plaintiff has stated a different cause of action. *Costantini v. Trans World Airlines,* 681 F.2d 1199, 1201 (9th Cir.1982). The Ninth Circuit looks at four criteria:

(1) Whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts. *Costantini,* 681 F.2d at 1201–02.

*C.D. Anderson & Co., Inc. v. Lemos,* 832 F.2d 1097, 1100 (9th Cir.1987). "The last of these criteria is the most important." *Id.*

### a. Same parties

The first issue which must be addressed is the issue of privity. As Plaintiffs point out, only Plaintiff Forest Guardians was listed as an actual plaintiff in the New Mexico litigation (hereinafter the *"Glickman"* case). Plaintiffs Southwest Center for Biological Diversity ("Southwest") and Robin Silver ("Silver") claim that res judicata cannot apply to them as they were not plaintiffs in the *Glickman* action.

. . . .

La Compania has asserted that Southwest and Silver are in privity with Forest Guardians, thus allowing the application of the res judicata doctrine to them. La Compania contends that all Plaintiffs are members of the Southwest Forest Alliance and receive funding through that umbrella organization, which in turn is used to fund litigation expenses in the Southwestern Region. La Compania also states that these parties have litigated numerous cases together, through common counsel, and clearly share the identical interests with respect to the issue in this case and the issue in the *Glickman* case. La Compania has cited an article from the *Journal North,* a New Mexico newspaper, which states in relevant part:

> Aided by $500,000 in grants in the past two years, environmentalists formed the Southwest Forest Alliance, an umbrella organization that boasts 50,000 individuals and 50 conservation organizations as members. *Those include* aggressive, litigation-minded outfits *such as Suckling's* [referring to Kieran Suckling, director of the Southwest Center for Biological Diversity] *and Forest Guardians* . . . .

*See* La Compania's Amicus Curiae Brief, Exhibit 12, pg. 2. Plaintiffs have provided no evidence to counter La Compania's contention that Southwest and Silver are in privity with Forest Guardians, as illustrated by the newspaper article.

The Ninth Circuit Court of Appeals has provided guidance with respect to an analysis of privity for preclusion purposes. In *United States v. ITT Rayonier, Inc.,* 627 F.2d 996 (9th Cir.1980), the court stated:

> The doctrine of privity extends the conclusive effect of a judgment to nonparties who are in privity with parties to an earlier action. In *Chicago, R.I. & P. Ry. Co. v. Schendel,* 270 U.S. 611, 46 S.Ct. 420, 70 L.Ed. 757 (1926), the Supreme Court characterized the relationship as one of "substantial identity" between parties. 270 U.S. at 621, 46 S.Ct. at 424.
>
> Courts are no longer bound by rigid definitions of parties or their privies for purposes of applying collateral estoppel or res judicata. . . . One who is not a party of record may be bound if he had a sufficient interest and participated in the prior action. . . .
>
> Further, "privy" may include those whose interests are represented by one with authority to do so. . . .
>
> Courts have recognized that a non-party may be bound if a party is so closely aligned with its interests as to be its "virtual representative." . . . This contemplates an express or implied legal relationship by which parties to the first suit are accountable to non-parties who file a subsequent suit with identical issues.

*Rayonier,* 627 F.2d at 1003 (citations omitted).

 Plaintiffs concede that Forest Guardians was a party to the *Glickman* suit, and further concede that if the court were to find res judicata applicable, it should dismiss Forest Guardians from this suit and allow Southwest and Silver to continue in this litigation. *See* Plaintiffs' Reply in Support of Motion for Preliminary Injunction ("Reply"), pg. 39. However, the court finds that privity exists between Forest Guardians, Southwest and Silver sufficient to bind all Plaintiffs under any res judicata analysis. All three Plaintiffs are members of the Southwest Forest Alliance.[11] "[T]he alliance [Southwest

---

11. It is clear from this case and from numerous other cases filed in this district that Robin Silver is a member of, and indeed at one time was the

director of, Southwest Center. *See Southwest Center for Biodiversity, et al. v. Thompson, et al.,* CIV 93–866 PCT SMM.

Forest Alliance] is designed to be the political voice of the region's forest activists." *See* La Compania's Amicus Curiae Brief, Exhibit 12, pg. 2. "For purposes of res judicata, privity exists where two parties represent the interests of the same entity." *In re Dominelli*, 820 F.2d 313, 317 (9th Cir.1987) (citing 1 B J. Moore, J. Lucas & T. Currie, Moore's Federal Practice ¶ 0.411[1] (2d ed.1984)).

There is no doubt that all three plaintiffs have identical interests with respect to the entire Southwestern Region. Their participation in the Southwest Forest Alliance clearly evidences this. Simply having a different member of the organization act as plaintiff in each suit should not be enough to allow the Alliance or its members to escape the bar of res judicata.

This situation is similar to that in the *Rayonier* case, cited *supra*. In that case, two different agencies of the federal government brought separate enforcement actions, one in federal court and one in state court, against a pulp mill. The Ninth Circuit found virtual representation between the governmental agencies because their interests in enforcing the Federal Water Pollution Control Act were identical and their involvement sufficiently similar to warrant a finding of privity. *See Rayonier*, 627 F.2d at 1003.

The interests of Forest Guardians and Southwest/Silver are identical—ensuring compliance with NEPA and the NFMA with respect to the La Manga Timber Sale. Although this lawsuit contemplates a challenge to the entire Region, there is no doubt that the La Manga Timber Sale is contained in that Region. Further, to say that Southwest/Silver knew nothing about the New Mexico litigation is disingenuous. All three plaintiffs were plaintiffs in the *Silver v. Thomas* case, discussed *supra*, and the issue of the La Manga Timber Sale was specifically discussed and addressed, as evidenced by the stipulation to allow the La Manga sale to be advertised for sale. *See Silver v. Thomas*, CIV 94–337 PHX RGS (Lead), Doc. # 454. The *Glickman* lawsuit was well underway at the time the stipulation in the *Silver* case

was entered. All three Plaintiffs were represented by the same counsel in the *Silver* case, and indeed the same counsel from the *Silver* case represents all Plaintiffs in this matter. Certainly counsel had to be aware of the details of the New Mexico litigation prior to entering into a stipulation in the *Silver* case the stipulation could have adversely affected Forest Guardians had it conflicted with the New Mexico litigation.[12] In fact, Judge Mechem noted the knowledge of the *Glickman* case by the parties to the *Silver* litigation, which include all Plaintiffs here:

> Both plaintiffs and defendants were aware when they entered into the settlement agreement in Arizona [in the *Silver* case] both this case and *La Compania Ocho, Inc.*, were pending in New Mexico. As a result, I must believe that when the parties drafted the settlement agreement in *Silver v. Thomas*, they did not intend for such a broad scale injunction so as to enjoin the Forest Service from proceeding with the La Manga Sale.... Therefore, based on Mr. Lucero's letter to La Compania, and the subsequent settlement agreements entered into in Arizona and New Mexico, I find that the only way to construe each document as effective and consistent with the other is to hold that the Arizona injunction does not apply to the La Manga Sale.

*See* Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction ("CPI"), Exhibit D, pg. 9.

Based upon the test for privity, and the facts as contained in the record before this court, the court must conclude that Southwest and Silver were in privity with Forest Guardians.

#### b. Same cause of action

##### 1. Established rights

Next the court must determine if the same causes of action are involved. The court must therefore consider the four factors noted by the Ninth Circuit, stated *supra*, in determining if this part of the res judicata

---

**12.** There is no evidence in the record as to whether or not counsel in this matter represented Forest Guardians in the New Mexico litigation.

test has been met. First, the court must determine whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action, i.e. this matter. Defendant and La Compania contend that an injunction in this matter, and indeed even a judgment on the only issue in this case, would basically eviscerate the judgment entered in the *Glickman* case. Plaintiffs do not speak to this particular issue. *See* Plaintiffs' Reply in Support of Motion for Preliminary Injunction, pp. 35–39. Therefore, absent any contradiction from Plaintiffs and based upon the record before the court, the court must accept Defendant's and La Compania's assertions and find that this prong of the res judicata test is met.

### 2. Evidence

Next, the court must determine if substantially the same evidence would be presented in the two suits. Although the court does not have the benefit of the parties' briefs in the *Glickman* case to consult in comparing the evidence presented in that case to the evidence in this case, the court believes it can make a determination in relation to this issue. Judge Mechem, in his Order dated January 29, 1997, noted plaintiffs' contentions in relation to the preparation of a supplemental EIS for the La Manga sale:

The EIS for the La Manga Timber Sale was issued in March 1994. Plaintiffs contend that since then the Forest Service has made the following changes in the La Manga sale area:

1) the issuance by the Forest Service of the following forest plan amendments:

A) cutting 140,000 board feet of timber in unit 17 of the sale where there was previously no harvest in that area;

B) increasing the harvest in sale unit 11 from 167,000 board feet to 250,000 board feet;

C) decreasing the amount of timber in unit 13 from 769,000 board feet to 200,000 board feet and in unit 2 from 656,000 board feet to 350.000 board feet;

D) a prohibition against cutting trees over 24 inches db in mixed conifer units;

2) a change from one large sale for Duke City Lumber with 2–3 three (sic) small sales for local operations, to 6–7 small sales:

3) the discovery of a Northern goshawk within the sale area; and,

4) the designation of critical habitat for the Mexican Spotted Owl, including the issuance of a biological opinion by the Fish & Wildlife Service under the Endangered Species Act.

*See* La Compania's Amicus Curiae Brief. Exhibit 6, pg. 5.

Although this is probably an incomplete listing of the evidence to be offered by plaintiffs in the *Glickman* case, it certainly shows the duplication of evidence presented in this matter. Obviously the Forest Service amendment is duplicative, as is the discovery of the Northern goshawk and the designation of critical habitat for the Mexican Spotted Owl. There is no doubt there is an overlap of evidence presentation in both cases.

All Plaintiffs state with respect to this prong of the test is that "[t]he evidence is also different." *See* Reply, pg. 38. This statement is insufficient to establish that the evidence is different in the two cases. Further, the test is not whether the cases involve the presentation of *identical* evidence, but rather whether the cases involve the presentation of *substantially the same* evidence. Based upon the record before the court, it is clear that the majority of evidence presented in both suits involve the presentation of substantially the same evidence.

### 3. Same right

The next step is to determine if both cases involved the same rights. The bulk of Plaintiffs' arguments in relation to the res judicata issue pertain to this prong of the test. Plaintiffs contend that this court cannot find res judicata because Judge Mechem, in the New Mexico litigation, already addressed the issue of Plaintiffs being able to litigate in this forum, and found that Plaintiffs could. While it is true that Judge Mechem did analysis with respect to whether or not the issues were the same, the analysis was in the context of issuing an injunction against the New Mexico plaintiffs from litigating in this

forum; it was not in the context of determining the applicability of res judicata. In fact, Judge Mechem clearly noted that the New Mexico plaintiffs *could* have brought the issue in this matter before him in the New Mexico case. *See* Plaintiffs' Reply, Exhibit 17, pg. 7. Judge Mechem merely found that he could not force plaintiffs in the New Mexico case to do so based upon the advanced state of the New Mexico case. *Id.* Judge Mechem's analysis in the context of an injunction to stop plaintiffs from litigating in this case does not establish that res judicata cannot be applied; the standards are clearly different in each circumstance, and as discussed in this Order, res judicata is applicable.

Plaintiffs also cite numerous instances in Judge Mechem's orders which find that the issues in the *Glickman* case are different than the single issue in this case. What Plaintiffs fail to address is that res judicata not only bars issues that were actually litigated, but which *could have been* raised. Therefore, while admittedly the issue in this case was not specifically raised verbatim in the *Glickman* case, there is no doubt that this issue could have, and should have, been raised in the *Glickman* case. The *Glickman* plaintiffs were litigating the sufficiency of the EIS for the La Manga Timber Sale, a part of the Southwestern Region, in light of the amendments to the LRMPs. Certainly the retroactivity of the amendments could have been addressed in the same litigation. As discussed *supra*, the evidence in relation to both issues is substantially the same. Judge Mechem did not find that the *Glickman* plaintiffs could not raise the issue in that matter; only that he could not force them to raise the issue in his case. Judge Mechem left the determination as to the potential res judicata effect of plaintiffs' decision in the *Glickman* case to the proper court, namely this one.

Therefore, although the court finds that the exact verbatim issue was not raised in this case and in the *Glickman* case, clearly the plaintiffs could have raised the sole issue in this case before Judge Mechem. Therefore, res judicata is applicable to the issue in this case.

### 4. Transactional nucleus of facts

Finally, the court must determine if the two suits arise out of the same transactional nucleus of facts. Again, Plaintiffs do not speak to this issue, but merely claim the two suits arise from a different transactional nucleus of facts. Based upon the record before the court. and as discussed *supra* in relation to the analysis of the other prongs of the res judicata test, both suits arise from the same transactional nucleus of facts. Both lawsuits involve violations of the NFMA with respect to areas within the Southwest Region. Both lawsuits arose in response to studies performed by the Fish & Wildlife Service (i.e. the biological opinion which resulted in part in the amendment to the LRMPs) and the actions taken in response thereto. The fact that one suit involves the entire region, while the other suit involves only a specific site within that region, does not alter this analysis.

■ Therefore, based upon consideration of these four factors, the court finds that both this matter and the *Glickman* case involved the same causes of action. Thus, the test for res judicata has been met, and the court must find that res judicata is applicable, at least with respect to the La Manga Timber Sale. Therefore, the motion for preliminary injunction is denied insofar as it seeks relief as to the La Manga Timber Sale.[13]

The court also finds that, based upon the policies behind the doctrine of res judicata, such a finding is appropriate in this case. There can be no question that Plaintiffs and other environmental agencies provide an invaluable service. Their watchdog efforts with respect to the Forest Service and other governmental agencies charged with the duty of environmental planning and protection are

---

**13.** Despite this Court's finding that Plaintiffs' Motion for Preliminary Injunction must be denied as to the La Manga timber sale based upon the principles of res judicata, the Court cannot lift the stay of that logging operation which was imposed by the Ninth Circuit Court of Appeals. Defendant and/or Amici Curiae must approach the Ninth Circuit Court of Appeals for relief from the stay imposed by that court.

necessary to ensure compliance with the environmental laws enacted by Congress to preserve this country's forests and the species which live therein.

However, there must also be respect for the judicial system and the resources allocated thereto. As Judge Mechem noted in his Memorandum Opinion and Order dated April 17, 1997:

> As to the issue of forum shopping, it is patently obvious that plaintiffs filing environmental cases in the Southwest Region have engaged and continue to engage in extensive forum shopping. The Forest Service and Congress, with power to do so, have failed to remediate this problem. The Forest Service allows forest regions to cross state and judicial circuit lines and Congress fails to restrict venue to require suits to be brought in the district wherein the property lies. The problem is particularly evident in situations such at (sic) this where any number of actions have been filed relating to the La Manga sale. The plaintiffs need to merely include lands in the Southwest Forest Region within New Mexico and Arizona and they have the option of bringing a case in Arizona or New Mexico. The plaintiff chooses the forum which it believes will provide the most beneficial result. Once the suit is filed, the chosen court with proper jurisdiction and venue appears bound to adjudicate with regard to lands outside of its district or circuit. Perhaps the only device a district court can invoke is to exercise its discretion and abstain, when available, from adjudicating issues relating to land outside of its district. With the current state of environmental forum shopping, I am unable to find that the plaintiffs' forum shopping is any more repugnant than that done frequently in the Southwest Region.

*See* Plaintiffs' Reply, Exhibit 17, pp. 6–7.

█ "[R]es judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 415,

66 L.Ed.2d 308 (1980). The problems which res judicata attempts to address were clearly involved in this case with respect to the La Manga sale. First, an injunction was imposed by Judge Muecke of this district in the *Silver* case which applied to the entire Southwestern Region. The Region encompasses both Arizona and New Mexico, despite the fact that New Mexico is not part of this judicial district, or even part of this judicial circuit. Next, Judge Mechem in the District of New Mexico in the *Glickman* case was forced to interpret the injunction issued by the *Silver* court in relation to a site-specific challenge involving a forest in New Mexico. His interpretation resulted in a finding that Judge Muecke's order did not apply to the La Manga Timber Sale. The Forest Service was then put in the untenable position of being caught between a rock and a hard place—either violate Judge Muecke's injunction and comply with Judge Mechem's order, or comply with the injunction and violate Judge Mechem's order. Luckily, the parties were able to resolve these issues without the need of resolving which district court judge should have been heeded.

Despite this obvious conflict between the *Silver* and *Glickman* cases. Plaintiffs in this matter brought suit, again in Arizona, raising a Region-wide issue, rather than bringing the issue before either the *Silver* or *Glickman* court. Judgment in the *Glickman* case was not entered until May of 1997, and final judgment in the *Silver* case was not entered until December of 1996. This case was filed in October of 1996. Therefore, there *could* have been a situation where this court would have had to interpret Judge Muecke's injunction and Judge Mechem's Orders and issue yet another injunction or order which could have conflicted with one or both orders. Fortunately, this court was not faced with such an undesirable task. But certainly the interests of judicial economy and consistency, as well as the interests of all parties concerned, would have better been served by raising the sole issue in this matter before either the *Silver* or *Glickman* courts.[14]

14. Because res judicata was only raised with respect to the *Glickman* case, and not the *Silver* case, the Court need not address res judicata in relation to the *Silver* case.

Therefore, not only does the specific test for res judicata demand such a finding in this case, but clearly the policies behind the doctrine of res judicata warrant that finding.

### 3. Remainder of preliminary injunction

With respect to the remainder of the preliminary injunction, the court finds that Plaintiffs have failed to meet their burden. Plaintiffs have first failed to show irreparable harm. The only harm alleged by Plaintiffs is harm which would result if the ROD is not applied retroactively. To allege that the irreparable harm to be suffered, and thus enjoined, is harm which the ROD in question would prohibit if found to be retroactive, which itself is the only question presented to this court as conceded by both parties, begs the question. In order for the harm to be suffered, this court must first determine if the ROD is retroactive. Only after that determination is made would the actions in question truly be considered harm. Therefore, Plaintiffs have failed to allege any actual, *existing* harm which would warrant injunctive relief from this court.

Thus, it is clear that in order to determine the merits of the remaining issues in relation to the motion for preliminary injunction, the court must first decide the merits of the pending motion for summary judgment. There can be no irreparable harm without a determination that the ROD is retroactive, nor can there be a showing of likelihood of success on the merits without such determination. Therefore, as this court originally determined, it must decide the motion for summary judgment prior to deciding the merits of the preliminary injunction.

Also, as will be discussed *infra* with respect to the motion for summary judgment, there is no likelihood of success on the merits for Plaintiffs. There has also been no showing that there exists serious questions going to the merits or that the balance of hardships tips sharply in favor of Plaintiffs. Therefore, absent any of the required elements for the imposition of a preliminary injunction, the court must deny Plaintiffs' Motion for Preliminary Injunction in all respects.[15]

. . . .

### D. Motion for Summary Judgment: motion to file supplemental memo

#### 1. Supplemental memo

Defendant has filed a Motion for Leave to File Supplemental Memorandum. Defendant seeks to address an issue he claims Plaintiffs raised for the first time in their reply to the Motion for Summary Judgment, namely the Defendant's position in relation to the consistency provisions of the NFMA. Plaintiffs did not oppose the motion, but filed a response to the supplemental memorandum instead. Therefore, the court will grant the motion to file supplemental memorandum and will consider Defendant's supplemental memorandum and Plaintiffs' response thereto in deciding the pending Motion for Summary Judgment.

#### 2. Standard

Summary judgment may be granted if the movant shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure.

Summary judgment is proper if the nonmoving party fails to make a showing sufficient to establish the existence of an essential element of his case on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The disputed fact(s) must be material. *Id.*

Substantive law determines which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

---

**15.** It should be noted that the imposition of injunctive relief by the Ninth Circuit Court of Appeals potentially moots any request for an injunction in this Court. However, because the Ninth Circuit Court of Appeals indicated in their Order that they only imposed injunctive relief until such time as this Court had the opportunity to rule on the merits of the motion for preliminary injunction, the Court has analyzed the merits of the motion for preliminary injunction. Obviously this Court's ruling does not lift the injunction imposed by the Ninth Circuit Court of Appeals.

Moreover, the dispute must be genuine. A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. In a civil case, the issue is:

> whether a fair-minded jury could return a verdict for the Plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the Plaintiff.

*Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512.

The opposing evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 242, 106 S.Ct. at 2510. *Aydin Corp. v. Loral Corp.,* 718 F.2d 897, 902 (9th Cir. 1983).

### *3. Application*

Plaintiffs contend that the decision issued by the Regional Forester on June 6, 1996 which amends the existing Forest Plan, violates NFMA because it only applies prospectively and does not comply with NFMA's consistency provision. Defendant contends that the consistency provision only applies to *revisions* of the Forest Plan, not *amendments,* and therefore the Regional Forester had the ability to issue an amendment which applied prospectively without violating the consistency provision of the NFMA.[16] Plaintiffs reply that there is no distinction between revisions and amendments in the NFMA and therefore they are entitled to judgment in their favor.

. . . .

### a. **Revision v. amendment**

The first issue which must be addressed is whether there is a distinction between an amendment to a LRMP and a revision to a LRMP. The beginning point in this analysis is the NFMA itself. Title 16, section 1604(f) states:

> Plans [land and resource management plans] developed in accordance with this section shall—
>
> (1) form one integrated plan for each unit of the National Forest System, incorporating in one document or one set of documents, available to the public at convenient locations, all of the features required by this section;
>
> (2) be embodied in appropriate written material, including maps and other descriptive documents, reflecting proposed and possible actions, including the planned timber sale program and the proportion of probable methods of timber harvest within the unit necessary to fulfill the plan;
>
> (3) be prepared by an interdisciplinary team. Each team shall prepare its plan based on inventories of the applicable resources of the forest;
>
> (4) *be amended* in any manner whatsoever after final adoption after public notice, and, if such amendment would result in a significant change in such plan, in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section; and
>
> (5) *be revised* (A) from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years, and (B) in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section.

16 U.S.C. § 1604(f) (emphasis added).

The Forest Service has also implemented rules and regulations, contained in the Code of Federal Regulations ("CFRs"), which are

---

**16.** Plaintiffs contend in a footnote in their reply to the preliminary injunction that Defendant knows that his position as to the prospective application of the ROD is "tenuous at best" because the Forest Service has acknowledged that changes may have to be made if this Court finds the ROD to apply retroactively. *See* Reply, fn. 15. Of course, this does not establish that Defendant believes his position to be without merit, but merely shows that Defendant is preparing for any possibility with respect to the outcome of this litigation.

relevant to this analysis. Section 219.10 contains procedures for amendment and revision:

(f) *Amendment.* The Forest Supervisor *may amend* the forest plan. Based on an analysis of the objectives, guidelines, and other contents of the forest plan, the Forest Supervisor shall determine whether a proposed amendment would result in a significant change in the plan. If the change resulting from the proposed amendment is determined to be significant, the Forest Supervisor shall follow the same procedure as that required for development and approval of a forest plan. If the change resulting from the amendment is determined not to be significant for the purposes of the planning process, the Forest supervisor may implement the amendment following appropriate public notification and satisfactory completion of NEPA procedures.

(g) *Revision.* A forest plan *shall* ordinarily be *revised* on a 10–year cycle or at least every 15 years. It also may be revised whenever the Forest Supervisor determines that conditions or demands in the area covered by the plan have changed significantly or when changes in RPA policies, goals, or objectives would have a significant effect on forest level programs. In the monitoring and evaluation process, the interdisciplinary team may recommend a revision of the forest plan at any time. Revisions are not effective until considered and approved in accordance with the requirements for the development and approval of a forest plan. The Forest Supervisor shall review the conditions on the land covered by the plan at least every 5 years to determine whether conditions or demands of the public have change (sic) significantly.

36 C.F.R. § 219.10(f–g) (emphasis added).

■ Based upon the language of the statute and the regulations implemented in response to the statute, it is clear there is a difference between an *amendment* to a plan and a *revision* to a LRMP. To hold otherwise would be contrary to the plain, written words of the statute and the regulations. For instance, the regulations state that the Forest Service shall revise a LRMP at least every 15 years, as does the NFMA. 16 U.S.C. § 1604(f)(4); 36 C.F.R. § 219.10(g). However, a LRMP *may* [17] be amended in any manner whatsoever. 36 C.F.R. § 219.10(f). The Forest Service does not even have to amend the LRMP if it chooses not to do so. *See Citizens for Environmental Quality v. U.S.,* 731 F.Supp. 970 (D.Colo.1989). Certainly the choice of verbiage selected by Congress and the Forest Service in relation to the provisions for revision and amendment denote an intention to differentiate the two procedures.

When, in drafting a statute, Congress uses both "may" and "shall," the normal inference is that each is being used in its ordinary sense—that one is being permissive, the other mandatory. *Anderson v. Yungkau,* 329 U.S. 482, 485, 67 S.Ct. 428, 430, 91 L.Ed. 436 (1947); *see also United States v. Thoman,* 156 U.S. 353, 359–60, 15 S.Ct. 378, 380–81, 39 L.Ed. 450 (1895).

*Haynes v. U.S.,* 891 F.2d 235, 239–40 (9th Cir.1989). The same rationale can be applied to the regulations issued by the Forest Service in order to implement the provisions of the NFMA.[18]

The other important difference between a revision and an amendment under the NFMA is evidenced by the procedures required to be undertaken in relation to each procedure. The LRMP shall be amended "in any manner whatsoever after final adoption after public notice." 16 U.S.C. § 1604(f)(4). The "in any manner whatsoever" language indicates an intention to provide discretion

---

**17.** Although the NFMA states that a LRMP *shall* be amended, it states that it shall be amended *in any manner whatsoever.* 16 U.S.C. § 1604(f)(4). As will be discussed *infra,* the addition of this language in relation to an amendment, despite the introductory inclusion of the word "shall", greatly differs from the treatment given to a revision of a LRMP. Also, the regulations which implement these provisions clearly denote that an amendment *may* be implemented, while a revision *shall* be implemented.

**18.** Additionally, it should be noted that neither party is contesting the validity of the regulations issued in order to implement the provisions of the NFMA.

on the part of the Forest Service to amend the LRMP. Further, an amendment need only comply with the provisions of 1604(d)–(f) in the event the amendment would result in a significant change in the LRMP. *Id.*

A revision, however, must be revised "from time to time when the Secretary finds conditions in a unit have significantly changed, *but at least* every fifteen years. . . ." 16 U.S.C. § 1604(f)(5)(A). Thus, while the Secretary has discretion in that a LRMP is to be revised when the Secretary finds conditions have changed, the Secretary *must* revise the LRMP at least every fifteen years. Additionally, *any* revision, whether it be a discretionary one prior to the expiration of the fifteen years or a mandatory one at the end of the fifteen years, *must* be in accordance with subsections (d)–(f) of 16 U.S.C. § 1604, the provisions requiring public participation, required assurances and required provisions. 16 U.S.C. § 1604(f)(5)(B). Certainly Congress, in providing two separate subdivisions within the same statute which provide for separate procedures with reference to an amendment to a LRMP and a revision to a LRMP, intended for there to be two separate procedures: an amendment procedure and a revision procedure.

■ Therefore, despite the apparent similarities in the dictionary definitions of "revise" and "amend", it is clear that Congress, and the Forest Service in implementing the provisions of the NFMA, intended a revision of a LRMP and an amendment of a LRMP to be two different, distinct procedures. Despite the Plaintiffs' exhaustive diatribe over the definitions of "amend" and "revise", there truly is a distinction between an amendment [19] and a revision to a LRMP.

### b. Characterization of ROD

■ Now that it has been determined that there is a difference between an amendment and a revision under the NFMA, it must be determined what the ROD in question qualifies as. Based upon the title of the ROD, the Record of Decision for *Amend-*

*ment* of Forest Plans, as well as its content, the ROD is an *amendment* to the Forest Plan, not a revision. *See* Plaintiffs' Memorandum Brief in Support of Plaintiffs' Motion for Summary Judgment ("Memo"), Exhibit 2, pg. 5 ("This decision is considered to have a short-term (5–10 years) life span. Each of the Region's forest plans are scheduled for *revision* beginning in 1996. At the rate of two to three forest plans per year, the *revision* process will be completed by 2003, *making this decision obsolete.*") (emphasis added); pg. 13 ("The standards and guidelines established by this *amendment* will be reviewed again during the forest plan *revision* process.") (emphasis added); *see also* Exhibit 3. Plaintiffs even state in their motion that "On June 6, 1996, Regional Forester charles Cartwright approved important *amendments* to the Forest Plans. . . ." *See* Plaintiffs' Motion for Summary Judgment, pg. 5. Thus, it is clear that the ROD in question is a non-significant [20] amendment to the Forest Plan, not a revision.

### c. Application of consistency provision

The true dispute is not whether this is an amendment or a revision, but whether the consistency provision of the NFMA applies to the amendment in this matter and whether the amendment must be applied retroactively. A brief background of the history of the NFMA will provide assistance in the analysis of the applicability of the consistency provision to an amendment and the retroactivity of the amendment in question.

The National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 et seq., requires the Secretary of Agriculture to develop land and resource management plans for units of the National Forest System. 16 U.S.C. § 1604(a). When the Secretary develops these plans, the NFMA requires him to comply with the National Environmental Policy Act of 1969 ("NEPA"), which in turn encompasses the duty to prepare environmental impact statements ("EISs").

---

**19.** The Court notes that its analysis in this matter only applies to non-significant amendments, such as the ROD contained in this matter.

**20.** The designation of the ROD as "non-significant" comes directly from the ROD. *See* Memo, Exhibit 2, pp. 11–14. Plaintiffs do not challenge this finding.

16 U.S.C. § 1604(g)(1); *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1511 (9th Cir.1992). The NFMA imposes substantive requirements as well, which have been promulgated as regulations. *See* 16 U.S.C. § 1604(g)(3); 36 C.F.R. § 219 et seq.

The NFMA envisions a two-stage approach to forest planning. *Mumma,* 956 F.2d at 1511; *Sierra Club v. Espy,* 38 F.3d 792, 795 (5th Cir.1994). At the first stage, "a team ... develops a proposed [Land Resource Management Plan ('LRMP')] together with a draft and final EIS." *Mumma,* 956 F.2d at 1511 (citing 36 C.F.R. § 219.10(a) & (b)). Once the LRMP is approved, "[d]irect implementation of the LRMP occurs at a second stage, when individual site-specific projects are proposed and assessed." *Id.* at 1512. These site-specific projects must be consistent with the stage-one, forest-wide plan. *Id.; Sierra Club,* 38 F.3d at 795 ("Site specific analysis ... must be consistent with the LRMP."); 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."); 36 C.F.R. § 219.10(e) ("[T]he Forest Supervisor shall ensure that ... all outstanding and future permits, contracts, cooperative agreements, and other instruments for occupancy and use of affected lands are consistent with the plan.").

The forest and site-specific plans may be incorporated by reference, or "tiered"—so that the site-specific plan need not reiterate issues adequately discussed in the forest plan. *See* 40 C.F.R. 1508.28 ("Tiering is appropriate ... [f]rom a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis."). *Sierra Club,* 38 F.3d at 796; *Headwaters, Inc. v. Bureau of Land Management, Medford Dist.,* 914 F.2d 1174, 1178 (9th Cir.1990). Both stages must, nevertheless, fully comply with the NFMA's regulations. *See* 16 U.S.C. § 1604(i) (requiring site-specific plans to be consistent with forest plans, which in turn must be consistent with NFMA's substantive requirements).

*Inland Empire Public Lands Council v. U.S. Forest Service,* 88 F.3d 754, 757 (9th Cir. 1996).

There are a few items which must be noted at this point. First, Plaintiffs are not challenging the validity of the LRMPs as they were adopted in the mid 1980's. Second, Plaintiffs are not claiming that the contracts, permits, etc. entered into prior to June 6, 1996, the effective date of the ROD in question, failed to comply with the LRMPs as they existed at that time. Finally, Plaintiffs are not challenging the validity of the ROD in question. Therefore, any contracts, permits, etc. entered into prior to June 6, 1996 *did comply* with the NFMA at the time they were entered into, i.e. these contracts, permits, etc. complied with the LRMP in existence. Plaintiffs are asking this court to hold that contracts, permits, etc. which were clearly valid at the time they were entered into are no longer valid in light of the ROD.

Again, the starting point in this inquiry is the statute itself. The provision in question states:

Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans. Those resource plans and permits, contracts, and other such instruments currently in existence shall be revised as soon as practicable to be made consistent with such plans. When land management plans are *revised,* resource plans and permits, contracts, and other instruments, when necessary, shall be revised as soon as practicable. Any revision in present or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights.

16 U.S.C. § 1604(i) (emphasis added) (hereinafter the "consistency provision").

There are also regulations implemented by the Forest Service which address the issue of consistency:

(e) *Plan implementation.* As soon as practicable after approval of the plan, the Forest Supervisor shall ensure that, sub-

ject to valid existing rights, all outstanding and future permits, contracts, cooperative agreements, and other instruments for occupancy and use of affected lands are consistent with the plan. Subsequent administrative activities affecting such lands, including budget proposals, shall be based on the plan. The Forest Supervisor may change proposed implementation schedules to reflect differences between proposed annual budgets and appropriated funds. Such scheduled changes shall be considered an amendment to the forest plan, but shall not be considered a significant amendment, or require the preparation of an environmental impact statement, unless the changes significantly alter the long-term relationship between levels of multiple-use goods and services projected under planned budget proposals as compared to those projected under actual appropriations.

36 C.F.R. § 219.10(e).

. . . .

Perhaps the simplest way of understanding the requirements of the consistency provision is to analyze each individual sentence in that provision. Plaintiffs have undertaken this analysis in attempting to show there is no difference under the NFMA between an amendment and a revision. As discussed *supra*, there is such a distinction. However, the micro-analysis of the consistency provision offered by Plaintiffs could be helpful in the determining whether the consistency provision applies to amendments of the LRMP.

(1) "Resource plans and permits, contracts, and other instruments for the use and occupancy of the National Forest System lands shall be consistent with the land management plans." As Plaintiffs correctly point out, this sentence was the general rule contained in the consistency provision prior to comments from the Department of Agriculture which provided limitations to this general rule. *See* Motion for Summary Judgment, pp. 14–15. This sentence is unlimited and, if enacted without any further language, would have required the Forest Service to *immediately* revise every resource plan, permit, contract and other instrument to be consistent with the Forest Plan (which at the time of

the statute still had to be implemented). This sentence does not provide any guidance to the inquiry before this court, except to note that *all* resource plans, permits, contracts and other instruments *shall* be consistent with the *land management plans.*

(2) "Those resource plans and permits, contracts, and other such instruments *currently in existence* shall be revised as soon as practicable to be made consistent with such plans." This sentence clearly refers to plans, permits, contracts, etc. which were in existence at the time the NFMA was enacted, i.e. 1976. Therefore, this sentence does not necessarily provide any guidance to the inquiry at hand. However, Plaintiffs note that the use of the word "revised" in this sentence takes on its plain, dictionary meaning. The court does not necessarily disagree with this proposition. Congress has only given the word "revision" and its forms a different meaning with respect to LRMPs. This sentence does not refer to LRMPs, but other plans, permits, etc. Therefore, it is perfectly consistent to find the ordinary usage of the word "revise" in relation to this sentence, yet find that Congress has given a separate significance to the word "revise" in the context of LRMPs.

(3) "When land management plans are *revised*, resource plans and permits, contracts, and other instruments, *when necessary*, shall be revised as soon as practicable." The language contained in this sentence clearly refers to the *revision* of a LRMP. Plaintiffs argue that in this sentence, the word "revise" should be given its ordinary, dictionary meaning, i.e. "change". However, "[i]n ascertaining the intent of Congress, we must 'interpret language in one section of a statute consistently with language of other sections and with the purposes of the entire statute considered as a whole.'" *American Tunaboat Ass'n v. Brown,* 67 F.3d 1404, 1408 (9th Cir.1995) (quoting *Adams v. Howerton,* 673 F.2d 1036, 1040 (9th Cir.), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982)).

As discussed *supra*, Congress has given a distinctive meaning to the word "revision" in § 1604 of the NFMA which includes proce-

dures by which such revision may occur in relation to LRMPs. This distinction sets "revision" apart from "amendment" which, ordinarily, would have similar meanings. Thus, Plaintiffs' argument that revision in the consistency provision has a different meaning than in the remainder of § 1604, which clearly gives a specific meaning to the word "revision" in relation to LRMPs, must be rejected. The third sentence of the consistency provision refers to a "revision", and this court must interpret the statute to mean what it says—it is applicable to revisions of the LRMPs, and is silent with respect to amendments of LRMPs. *See Cramer v. C.I.R.*, 64 F.3d 1406, 1412 (9th Cir.1995) ("It is a fundamental rule of statutory construction that '[w]hen Congress includes a specific term in one section of a statute but omits it in another section of the same Act, it should not be implied where it is excluded.' ").

Again, the reference to "revision" of plans, contracts, etc. can be interpreted as the common meaning of the word without contradicting this court's finding that the word "revision" has a separate significance in relation to LRMPs.

(4) "Any revision in present or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights." Again, the specific reference to revision warrants an interpretation that this provision does not apply to amendments of the LRMP.[21]

Based upon this analysis of the consistency provision, it appears to this court that such provision only applies to the revision of LRMPs, and does not warrant action in the event the LRMPs are amended, as in this matter.

The cases cited by Plaintiffs in support of their contention that the consistency provision is applicable to the ROD in question are distinguishable from the facts of this case. First of all, most of the cases cited by Plaintiffs simply state that all permits, etc. must comply with the LRMP. As previously pointed out, all permits, etc. entered into prior to June 6, 1996 *did* comply with the LRMP in existence at the time. These cases are silent about subsequent *amendments* and their applicability to pre-existing contracts, permits, etc.

As for the remainder of the cases cited by Plaintiffs, they can be distinguished on their facts. The *Nevada Land Action Ass'n v. U.S. Forest Service* case, 8 F.3d 713 (9th Cir.1993), involved a challenge to a LRMP by individuals with grazing permits which were affected by the LRMP. The plaintiffs contended that the LRMP did not comply with the NFMA and NEPA. The challenge was not, however, related to any retroactive application of the LRMP; the LRMP prospectively limited the amount of grazing lands available. Thus, the case involved a LRMP, not an amendment to a LRMP, and the action was not challenged as retroactive.

The *Mahler v. U.S. Forest Service*, 927 F.Supp. 1559 (S.D.Ind.1996) case challenged an amendment to a LRMP. Plaintiff's claim was that the amendment, which reduced by more than 40% the total scale of permitted timber harvest and sales within a forest but stated that the disputed area was suitable for timber production, did not comply with the NFMA, NEPA and the Migratory Bird Treaty Act ("MBTA"). In the *Mahler* case, the amendment in question applied *prospectively*, although there was no challenge to this application of the amendment. If anything, the *Mahler* decision supports a finding that amendments to LRMPs do *not* apply retroactively.

In *U.S. v. Gardner*, 903 F.Supp. 1394 (D.Nev.1995), defendant had grazing permits in a national forest in Nevada. The permit contained language that it was subject to cancellation or suspension at any time for failure to comply with the terms of the permit. After a fire occurred in the national

---

**21.** It should be pointed out at this juncture that Plaintiffs, in pointing out current permits and contracts which allegedly violate the ROD, fail to address this particular portion of the consistency provision. As Defendant has pointed out, some of the contracts entered into pre-ROD are subject to injunctions or orders by other courts, and any alteration of these contracts would violate court orders. *See* Defendant's OPI, pg. 11; Response, pg. 22–23. Therefore, taking into account the existing rights of the parties to these permits and contracts, there arguably could be *no* permits or contracts which violate the ROD.

forest, the Forest Service, in compliance with its LRMP for that forest, reseeded the burned area and informed defendant that he could not graze on that portion of their permit area. When defendant would not comply, the Forest Service cancelled the permits and brought suit for trespass and unauthorized grazing. The court found that the Forest Service could bring such an action and found for the Forest Service. In the *Gardner* case, there was no amendment to a LRMP; a fire resulted in conditions which, under the *existing* LRMP, required no grazing, and thus required the parties to comply with the terms of the permit as it was executed, i.e. that the permit would comply with the existing LRMP. This was not a retroactive application of an amendment, as Plaintiffs contend.

A final case cited in a footnote by Plaintiffs, *Southern Timber Purchasers Council v. Alcock*, 779 F.Supp. 1353 (N.D.Ga.1991), *vacated on other grounds, Region 8 Forest Service Timber Purchasers Council v. Alcock*, 993 F.2d 800 (11th Cir.1993), provides the most comprehensive outline of the procedures by which a LRMP is amended; however, it does not hold that an amendment to an LRMP must be applied retroactively. The challenge in that case was that the Forest Service failed to timely and properly amend an LRMP to include materials related to red cockaded woodpecker populations. In fact, the court in that case held that an agency has the discretion to apply a rule or policy retroactively if to do so would be reasonable. *Southern Timber*, 779 F.Supp. at 1360 (citing *United States v. An Article of Drug Neo-Terramycin*, 540 F.Supp. 363, 373 (N.D.Tex. 1982), *aff'd*, 725 F.2d 976 (5th Cir.1984)).

Therefore, even cases cited by Plaintiffs do not provide the authority Plaintiffs claim. In fact, after an exhaustive search, this court cannot find *any* caselaw which directly addresses this issue. The caselaw does not mandate that this court reach a different interpretation of the consistency provision from that which it reached *supra*.

▮▮▮ Finally, the court must defer to Defendant's interpretation of the consistency provision contained in the NFMA. The Ninth Circuit Court of Appeals has stated:

An agency's interpretation of a statute is a question of law that we [the Ninth Circuit] review de novo. *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 783 (9th Cir.1995). In that review, we ask two questions. First, we must determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If so, we give force to the "unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. at 2782. If the statute is silent or ambiguous on a particular point, however, we defer to the agency's interpretation if it is a "permissible construction of the statute." *Id.*

*Conlan v. U.S. Dept. of Labor*, 76 F.3d 271, 274 (9th Cir.1996).

As the court discussed *supra*, Congress did directly speak to the question at issue-the consistency provision only applies to revisions. However, even if the court were to find the statute ambiguous as to its application, it would have to defer to Defendant's interpretation as long as the interpretation was a permissible construction of the statute. There is nothing in the record which would indicate that Defendant's interpretation of the statute in question is not a permissible construction.

In light of the foregoing discussion, the court finds that the consistency provision of the NFMA does not apply to amendments to the LRMPs, and therefore Plaintiffs' arguments with respect to this issue must be rejected.

#### d. Retroactivity

▮▮▮ The court must still determine whether the ROD should be applied retroactively, despite the inapplicability of the consistency provision to the ROD. In determining the retroactivity of a statute, the United States Supreme Court has devised an analysis to be undertaken by a court:

When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done

so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf v. USI Film Products,* 511 U.S. 244, 280, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994). The Ninth Circuit Court of Appeals has adopted the *Landgraf* reasoning and further explained that if a statute is substantive, a presumption against retroactive application applies, while a procedural statute receives a presumption in favor of retroactive application. *Chenault v. U.S. Postal Service,* 37 F.3d 535 (9th Cir.1994). The above rationale applies equally to administrative decisions, such as the ROD involved in this matter. *See Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493, (1988); *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). "Agencies generally do not have the authority to issue rules having retroactive effect in the absence of an express Congressional grant of such authority." *American Min. Congress v. U.S.E.P.A.,* 965 F.2d 759, 769 (9th Cir.1992).

■ There is no doubt that the ROD would operate retroactively to impair existing rights or impose new liabilities upon the parties to the permits, contracts, etc. There is also no doubt that the ROD is a substantive measure. Therefore, this court must start with the presumption that the ROD is prospective only. The only provision of § 1604 which potentially addresses the issue of retroactivity with respect to amendments is § 1604(i). As discussed *supra,* that provision does not provide any clear Congressional intent that the ROD should be applied retroactively. In fact, as pointed out by Defendant, Plaintiffs fail to cite to one case or statutory provision which specifically requires the application of the ROD retroac-

tively. Thus, the court, under the analysis provided by the United States Supreme Court and the Ninth Circuit Court of Appeals pertaining to retroactive application of statutes, must find that the ROD should not be applied retroactively.

Public policy also favors a finding of non-retroactivity. As discussed *supra,* the Forest Service does *not* have to amend any LRMPs, although it must revise LRMPs every set number of years or when a *significant* change occurs in the unit. *See* 16 U.S.C. § 1604(f)(5). Defendant points out the numerous public policy considerations which would be affected by a retroactive application of the ROD:

> Broad policy implications arise over rates of implementation for forest plan amendments. An amendment that changes a standard for designing projects or permits could potentially put all or most existing permits, activities, and contracts out of compliance. National Forest actions have long, expensive, and public processes for designing and completing projects, typically five years or more. When a new issue is raised and studied, information accumulates rapidly. To the degree practicable, the new information is incorporated as projects are developed. Going back to the beginning of the process with each new increment of information would easily prevent either the project or the governing plan from ever being completed.

> There are thousands of permits and activities ranging from firewood gathering, fences, ditches, roads, electronic sites, campgrounds, and so forth. Fore example, land use authorizations in the Southwestern Region alone have 1650 grazing permits and approximately 6500 other authorizations. Depending on the nature of a plan amendment, there is no practical way to simultaneously change or cancel all existing projects and those well along in the decision making process. Such a requirement of retroactive application would result in overwhelming resistance to future plan amendments by potentially affected parties.

*See* Response, pp. 22–23. Defendant also notes damages such as the return of grazing fees, the removal of cattle and the effects on timber harvesting and manufacturing.

Certainly if the Forest Service had to retroactively apply every non-significant amendment it made to a LRMP, it potentially would never amend an LRMP. Any new information which did not rise to the level of significant *within a unit,* as stated in 16 U.S.C. § 1604(f)(5), would potentially not be utilized in *any* new projects. It is clearly in the public interest to have the Forest Service constantly incorporating new information into LRMPs, even if such information does not have an impact of a significant level which would warrant a revision.

Plaintiffs' "Doomsday" prediction as to the fate of the NFMA should this court find the amendment in question not to apply retroactively is exaggerated at best. Plaintiffs envision a Forest Service which enacts "Potemkin village"[22] LRMPs with numerous amendments contrary to those LRMPs. First, the NFMA is not the only limitation on the powers of the Forest Service. Any amendment must comply with the other environmental statutes, as evidenced by the EIS prepared in relation to the amendments in question in this matter. The Forest Service would be subject to litigation on any violations of those statutes.

Second, the NFMA provides for public notice for *any* amendments to a LRMP, and any *significant* amendments must comply with the procedures set out for *revisions.* *See* 16 U.S.C. § 1604(f). Even non-significant amendments, such as the ROD in question here, must be presented to the public.

Finally, a finding that a non-significant amendment need not be applied retroactively does not give the Forest Service carte blanche to do whatever it pleases in the National Forest System. Any projects which are undertaken after any amendment *must comply with the amendment,* as in this case. Additionally, a finding that an amendment

does not apply retroactively does not hold that an amendment can contradict a LRMP. Again, as is clear from Plaintiffs' long history of litigation in the Southwestern Region, any actions by the Forest Service adverse to any environmental statute or an LRMP will be promptly brought to the attention of a court.

What the Plaintiffs must keep in mind is that the NFMA has more goals than just to protect the Northern goshawk and the Mexican Spotted Owl. The NFMA sets forth its goals:

(A) insure consideration of the economic and environmental aspects of various systems of renewable resource management, including the related systems of silviculture and protection of forest resources, to provide for outdoor recreation (including wilderness), range, timber, watershed, wildlife, and fish;

(B) provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan;

(C) insure research on and (based on continuous monitoring and assessment in the field) evaluation of the effects of each management system to the end that it will not produce substantial and permanent impairment of the productivity of the land;

(D) permit increases in harvest levels based on intensified management practices, such as reforestation, thinning, and tree improvement if (i) such practices justify increasing the harvests in accordance with the Multiple–Use Sustained–Yield Act of 1960, and (ii) such harvest levels are decreased at the end of each planning period if such practices cannot be successfully implemented or funds are not received to

---

**22.** Plaintiffs use this phrase in their Motion for Summary Judgment. It is taken from a Russian story that Potemkin once had impressive fake villages built along a route that Catherine the Great was to travel, and is defined as an impos- ing or pretentious facade or display designed to obscure or shield an unimposing or undesirable fact or condition. *See* Webster's Third International Dictionary.

permit such practices to continue substantially as planned;

**(E)** insure that timber will be harvested from National Forest System lands.... and

**(F)** insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System lands....

16 U.S.C. § 1604(g)(3)(A)–(F). The NFMA envisions timber harvesting, grazing, outdoor recreation, and the maintenance of a variety of species of both animals and trees. The Forest Service, in balancing all of the many facets of the NFMA, must have discretion to apply a non-significant amendment prospectively. This court must consider the goals of the statute, as well as the public policy involved, and in so doing, finds that the ROD should not be applied retroactively.

. . . .

Therefore, in light of all considerations related to the retroactivity of the ROD, the court finds that the Forest Service's decision to apply the ROD prospectively is in accordance with law and with public policy.

### E. Motion for Reconsideration

In light of the foregoing discussion, Plaintiffs' Motion to Reconsider Stay of Preliminary Injunction Motion is denied as moot.

In accordance with the foregoing,

IT IS ORDERED denying Plaintiffs' Motion for Preliminary Injunction [Doc. # 8].

FURTHER ORDERED denying Plaintiffs' Motion for Reconsideration [Doc. # 15] as moot.

FURTHER ORDERED granting Stone Container Corporation's Motion to Intervene [Doc. # 16].

FURTHER ORDERED denying Intervenor's Motion for Summary Ruling [Doc. # 28] as moot.

FURTHER ORDERED granting Defendant's Motion for Leave to File Supplemental Memorandum [Doc. # 29].

FURTHER ORDERED denying Intervenor's Motion for Ruling on Motion to Intervene and Cross–Motions for Summary Judgment [Doc. # 33] as moot.

FURTHER ORDERED granting Plaintiffs' Motion to Exceed the Page Limit [Doc. # 39].

FURTHER ORDERED denying Precision Pine's Motion to Intervene [Doc. # 40–1].

FURTHER ORDERED granting Precision Pine's Motion to File Amicus Curiae Brief [Doc. # 40–2].

. . . .

FURTHER ORDERED denying Precision Pine's Motion for Accelerated Briefings and Hearings [Doc. # 40–3].

FURTHER ORDERED granting La Compania's Motion to Participate as Amicus Curiae [Doc. # 43].

FURTHER ORDERED denying Plaintiffs' Motion for Summary Judgment [Doc. # 7].

FURTHER ORDERED granting Defendant's Cross–Motion for Summary Judgment [Doc. # 20]. Plaintiffs' complaint and cause of action are dismissed with prejudice. The Clerk of the Court shall enter judgment accordingly.